COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Kelsey and Beales
Argued at Richmond, Virginia

RICHARD TURNER MOTER

                                                    OPINION BY
v.      Record No. 1301-11-2                JUDGE D. ARTHUR KELSEY
                                                    FEBRUARY 19, 2013

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
J. Howe Brown, Jr., Judge Designate

Sarah L. Abernathy, Assistant Public Defender (Office of the Public
Defender, on brief), for appellant.

Steven A. Witmer, Senior Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.

The trial court convicted Richard Turner Moter of three counts of computer harassment

in violation of Code § 18.2-152.7:1 and revoked his suspended sentence for a previous stalking

conviction. On appeal, Moter contends the evidence failed to prove his guilt. We disagree and

affirm.

I.

When presented with a sufficiency challenge on appeal, we review the evidence in the

"light most favorable" to the Commonwealth. Commonwealth v. Hudson, 265 Va. 505, 514, 578

S.E.2d 781, 786 (2003). This principle requires us to "discard the evidence of the accused in

conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to

the Commonwealth and all fair inferences to be drawn therefrom." Parks v. Commonwealth,

221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis and citation omitted).

The background for Moter's present offenses began in 2006 when he was convicted of

stalking C.V. At the time, Moter was 37 years old and C.V. 19. From then until now, Moter has

claimed he and C.V. dated and had a sexual relationship. At trial, C.V. testified she never dated Moter or had sex with him.[1]

During the 2006 stalking episodes, Moter scratched C.V.'s car with a sexually explicit message. See App. at 114. He later wrote C.V.'s name and address on a stop sign near her home, using a similar vulgarity to describe C.V. to her neighborhood. Id. at 138. The terms of his suspended sentence forbade him from having any further contact with the victim. But even after his initial conviction, Moter continued to make unwanted contact with C.V. He called her "at all hours [of] the night" and sent letters "in the mail" as well as numerous e-mails. Id. at 112. In his letters, Moter persistently used vulgar sexual references. Id. at 121. C.V. did not reply to any of Moter's communications.

In 2007, Moter pled guilty to a second incident of stalking C.V. and also pled guilty to sending her a letter threatening death or bodily injury. Id. at 35. Moter had sent C.V. a message saying he would "put a knife in [her] back" if she attended a particular Christmas Eve concert. Id. at 166. This time, the court sentenced Moter to five years in prison for the felonious threat and twelve months for the second stalking offense. Id. at 35. The court imposed the time for the stalking conviction and suspended four of the five years on the felonious threat conviction. Id. Once again, the sentencing court conditioned Moter's suspended sentence on complying with the court's order to have no contact with C.V.

After a brief respite, Moter continued his prior pattern of harassment. He wrote C.V. a letter on November 1, 2009, recounting his prior scratching of her car with "bad words" and "leaving evil phone messages." Id. at 383. He claimed she needed to "own up to [her] part in this business" and understand "how much [she] made [him] suffer." Id. at 385. He also mentioned that a prior girlfriend had accused him of rape. He claimed that on "our first date . . .

_____

[1] For purposes of protecting the victim's privacy, we identify her only by her initials.

my penis was <u>in you</u>.  Did I rape you when you said no?  IN YOU."  <u>Id.</u> at 386 (emphasis in original).  Moter added that his "just met" girlfriend and his prior "live-in girlfriend" had both been raped, <u>id.</u> at 387, but he did not mention the identity of the rapists.  Throughout the letter, Moter accused C.V. of lying about their relationship.

C.V. testified that the letter "[t]errified" her.  <u>Id.</u> at 121.  The most disturbing parts, she said, were the "random" remarks "about ex-girlfriends he had that have been raped" and the "detail about the raping."  <u>Id.</u> at 122.  It was "bone chilling to me," C.V. testified.  <u>Id.</u>  Unnerved by Moter's actions, C.V. testified:  "I was amazed it [was] still going on.  I mean here I am seven years later and he's been to jail again and again and nothing is stopping him.  Nothing."  <u>Id.</u> at 118.  After she contacted the authorities, Moter was convicted of violating the terms of his prior suspended sentences and received another brief term of incarceration, along with another round of re-suspended sentences.

About a year later, between November 20 and 25, 2010, Moter sent more than forty computer-generated messages to C.V. via her Facebook account.  The first message on November 20 read in part:  "Our secret?  You know I won't tell!! . . .  I'll give you a baby. . . . I'll be your sugar daddy and spoil you . . . make me your backdoor man."  <u>Id.</u> at 393.  Another message on November 22 stated in part:  "You really think you don't owe me an apology after lying under oath and lying to the police about partying with me, having my cock rubbed by you and rubbed on your puss."  <u>Id.</u> at 130, 394.  Moter then began one of his twisted concurrent themes:  He threatened to charge C.V. with perjury if she continued to refuse to "write back."  <u>Id.</u>

A message sent on the following day, November 23, read in part:  "[Y]ou ought to beg me to suck my dick after lying to put me in prison.  What were you thinking?  Your 24 now.  Not a kid and I want an answer please."  <u>Id.</u> at 407.  Another message continued the same theme:  "I feel good except for lack of sex (and depression related to that).  I am ready for just about

- 3 -

anything. . . .  I hope your the hottest girl in all of downtown.  I'm sure some men think you are.

I do.  Not really.  I used to think you'd be super orgasmic and really hot but I wonder now."  Id.

at 408.[2]  This message was followed by another one on the same day, stating:

> I guess I should keep taking a little Xanax everyday for now.  If
> the jail had not of forced me to stop taking it . . . I would not have
> sent you "threat" e-mail years ago. . . .  [and] wrote on your
> stopsign -{it was a flank attack by the way-stonewall/hooker}. . . .
> You and your boyfriend are probly just right for each other.  I'm
> sure that Victoria's Secret stuff gets your cooter wet . . . .  Honestly
> I just don't think that your that hot and when I was your age I was
> doing better. So there. Stalk that. Bitch. . . .  I have chicks to fuck
> and buds to smoke, little miss sappy pants, but when I jack off . . . i
> think of you taking a fat . . . cock exploding cum all in you and
> flooding your pussy with sperm, my hot slut wife.  Now that is hot.
> Put your stuff on for your boy bitch.

Id. at 412.  The series of similar messages continued for the next two days.  His messages

included the following:

> I know your into the next Howie who really will cut your head off
> like his next girl got it . . . . I could see [C.V.] heading down the
> wrong road . . . .  Death Cab for Cutie for REAL. . . .  please don't
> call the cops . . . . deal with this on your own please.  Call me.
> Text me here.

Id. at 413 (November 23) (capitalization in original).  "It's well known your a leapfrog.  Leaping

from cock to cock, stopping to piss once in a while . . . .  haha."  Id. at 421 (November 24).

"[Y]our day is coming.  God is real and people like you learn that the hard way.  It's called

Karma and yours is catching you."  Id. at 422 (November 24).

> You lucky, [C.V.] THAT i AM NOT A VINDICTIVE PSYCHO
> WHO IS OUTSIDE your window right now ready to take revenge
> on you. . . .  I only want justice in the courtroom.  Otherwise I

---

[2] Throughout this opinion, we quote Moter's messages as written, without noting his misspellings and grammatical errors.  And because of the nature of Moter's convictions, we regrettably must repeat his statements verbatim without sanitizing his profanities.

> would come straight to your house and gave you justice in one
> minute long ago.

Id. at 423 (November 24) (capitalization in original).

> My favorite is the one Bop told me. . . .  He said after I wrote on
> the stopsign you came up to him and his buddys and said, "I want
> . . . cock."  He said the[y] fucked you in the backseat of his car . . .
> and that they hit you in the ass.  Ha ha! . . . .  Got the jungle fever I
> heard.  Love is real and not fade away . . . Bop Bop Bop mBop!

Id. at 425 (November 24).

At trial, Moter took the stand in his own defense.  He admitted he had stopped taking

Xanax, a form of "anxiety medication," causing him to become "kind of manic."  Id. at 227.  He

had also been taking "vicodin" and "oxycodone" for a back injury.  Id. at 228.  He acknowledged

his use of capitalization in some of his messages, specifically the one which said, "You lucky,

[C.V.] THAT i AM NOT A VINDICTIVE PSYCHO WHO IS OUTSIDE your window right

now ready to take revenge on you," id. at 423, but claimed the capitalization was just a "typo,"

id. at 237.

At trial, Moter's counsel conceded Moter had an "intent to harass" C.V. with his

messages.  Id. at 173 (motion to strike after Commonwealth's case); see also id. at 134

(concession during evidentiary phase of trial); id. at 192 (trial court noting defense "conceded the

intent"); Oral Argument Audio at 12:24 (repeating concession on appeal).  Moter's counsel

nonetheless argued the messages were neither obscene nor threatening.

Sitting as factfinder, the trial court disagreed.  Finding "the emails of November 22, 23,

and 24 are obscene and threatening," the court convicted Moter of violating Code § 18.2-152.7:1

and the terms of his prior suspended sentence.  In refusing to re-suspend his sentence yet again,

the court concluded:  "Only prison can protect [the victim] and help Mr. Moter."  App. at 372.

II.

On appeal, Moter challenges the sufficiency of the evidence. As a matter of law, he argues, his messages to C.V. do not violate Code § 18.2-152.7:1. We disagree.

A.  THE TEXT AND CONTEXT OF CODE § 18.2-152.7:1

Code § 18.2-152.7:1 is remarkably clear: "If any person, with the intent to coerce, intimidate, or harass any person, shall use a computer or computer network to communicate obscene, vulgar, profane, lewd, lascivious, or indecent language, or make any suggestion or proposal of an obscene nature, or threaten any illegal or immoral act, he shall be guilty of a Class 1 misdemeanor." Upon a showing of the required *mens rea* — an intent to coerce, intimidate, or harass — the statute criminalizes the sending of computer messages that:

- communicate obscene, vulgar, profane, lewd, lascivious, *or* indecent language,

- *or* make any suggestion or proposal of an obscene nature,

- *or* threaten any illegal or immoral act.

The *actus reas* portion of Code § 18.2-152.7:1 includes three disjunctive elements. Any one of the three, standing alone, is sufficient to violate the statute.

The Virginia Supreme Court held in Barson v. Commonwealth, 284 Va. 67, 726 S.E.2d 292 (2012), that the first disjunctive element — an "obscene, vulgar, profane, lewd, lascivious, *or* indecent" communication — really means only an obscene communication. Merely vulgar, profane, lewd, or lascivious communications, Barson held, do not violate Code § 18.2-152.7:1, thereby effectively excising those terms from the statute. Barson, 284 Va. at 74, 726 S.E.2d at 296 (reversing conviction for a merely "vulgar" communication).

To be truly obscene, Barson added, the communication must also violate another statute, Code § 18.2-372, Virginia's codification of the First Amendment's pornography exception recognized in Miller v. California, 413 U.S. 15 (1973). Under this statute:

The word "obscene" where it appears in this article shall mean that which, considered as a whole, has as its dominant theme or purpose an appeal to the prurient interest in sex, that is, a shameful or morbid interest in nudity, sexual conduct, sexual excitement, excretory functions or products thereof or sadomasochistic abuse, and which goes substantially beyond customary limits of candor in description or representation of such matters and which, taken as a whole, does not have serious literary, artistic, political or scientific value.[3]

Code § 18.2-372.[4]

The second disjunctive element of Code § 18.2-152.7:1 — suggesting or proposing

something of an "obscene nature" — also presumably requires a court to employ the

---

[3] The "article" mentioned in Code § 18.2-372 is Article 5 of Chapter 8 of Title 18.2. The computer harassment statute appears in Article 7.1 of Chapter 5 of Title 18.2. Barson held this to be a distinction without a difference. Barson, 284 Va. at 72-74, 726 S.E.2d at 295-96.

[4] Barson did not explain why the first disjunctive element, itself stated in the disjunctive, must be collapsed into the single word "obscene." Instead, Barson adopted the reasoning of a prior panel opinion from our Court, Allman v. Commonwealth, 43 Va. App. 104, 596 S.E.2d 531 (2004). As then-Judge McClanahan later explained, however, Allman

wrongly imported pure *First Amendment* free speech principles to limit the proscription of this harassment statute to only words of intimidation that "appeal to the prurient interest in sex," i.e., words that meet the definition of "obscene" for purposes of *First Amendment* analysis. The statute in this case (Code § 18.2-152.7:1), like the one at issue in Allman (Code § 18.2-427), proscribes intimidating, harassing conduct — not merely speech. The words used to exhibit such conduct are not protected speech under the *First Amendment*. . . . And "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat." Id. at 360. Because the statute here and in Allman address threatening and harassing conduct, the definition of "obscene" under a pure *First Amendment* free speech analysis does not apply.

Airhart v. Commonwealth, No. 1219-05-2, 2007 Va. App. LEXIS 11, *10 (Va. Ct. App. Jan. 16, 2007) (McClanahan, J., concurring); see also Barson, 284 Va. at 77, 726 S.E.2d at 297-98 (Russell, J., concurring) ("we do not consider the Miller test to be constitutionally mandated when applied to statutes regulating harassing conduct"). Courts interpreting similar state harassment statutes have found the Miller standard inapplicable. See Baker v. State, 494 P.2d 68 (Ariz. 1972); People v. Hernandez, 231 Cal. App. 3d 1376, 1383-86 (Cal. App. 1991); State v. Keaton, 371 So. 2d 86 (Fla. 1979); State v. Jaeger, 249 N.W.2d 688, 691 (Iowa 1977); People v. Taravella, 350 N.W.2d 780 (Mich. 1984); State v. Kipf, 450 N.W.2d 397, 404-05 (Neb. 1990); People v. Cirruzzo, 281 N.Y.S.2d 562, 563 (N.Y. 1967); State v. Crelly, 313 N.W.2d 455, 457 (S.D. 1981).

pornography definition of obscenity under the reasoning of <u>Barson</u>. And, because obscenity under <u>Barson</u> requires an "appeal to the prurient interest in sex" under Code § 18.2-372, the second element of Code § 18.2-152.7:1 apparently involves a suggestion or a proposal to share in the accused's prurient sexual interests.

The third disjunctive element — a communication that threatens "any illegal *or* immoral act" — does not require any proof of obscenity. An illegal act violates the criminal code; an immoral act violates society's social code reflecting its collective sense of moral propriety. Either act satisfies the third showing under Code § 18.2-152.7:1. It is "immaterial" whether a communication is obscene if it involves "threats to commit illegal or immoral acts, where the threat is made with the intent to coerce, intimidate or harass any person." <u>Rives v. Commonwealth</u>, 284 Va. 1, 2-4, 726 S.E.2d 248, 249-50 (2012) (distinguishing <u>Barson</u> and interpreting identical statutory language in Code § 18.2-427).

### B. APPELLATE STANDARD OF REVIEW

Though the interpretation of statutory terms involves questions of law, whether a particular communication "appeals to the 'prurient interest'" and "is 'patently offensive'" are "essentially questions of fact." <u>Miller</u>, 413 U.S. at 30. Thus, as with all other factual issues on appeal, we do not ask "whether the materials *are* obscene, but, rather, whether the materials *create a jury issue* as to obscenity" — that is, whether a "reasonable trier of fact" could come to that conclusion. <u>Allman v. Commonwealth</u>, 43 Va. App. 104, 111-12, 596 S.E.2d 531, 535 (2004) (citation omitted), <u>relied</u> <u>on</u> <u>by</u> <u>Barson</u>, 284 Va. at 70-74, 726 S.E.2d at 294-96.

The same can be said for the question whether a communication threatens an "immoral act" under Code § 18.2-152.7:1. The existence of a threat, as well as the immorality of the threatened act, must be decided by factfinders who have the opportunity to see and hear the "living record," <u>James v. Commonwealth</u>, 53 Va. App. 671, 677, 674 S.E.2d 571, 574 (2009)

(citation omitted), revealed during the adversarial process of a courtroom trial. That vantage point into the truth simply does not exist on appeal. Limited to transcripts and after-the-fact arguments, we are institutionally incapable of "reweigh[ing] the evidence" and presiding "*de novo* over a second trial." Id. (citation omitted).

Finally, it makes no difference that a trial judge, rather than a jury, sits as factfinder. In a bench trial, a trial judge's "major role is the determination of fact, and with experience in fulfilling that role comes expertise." Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004) (citation omitted). For this reason, we examine trial court factfinding "with the highest degree of appellate deference." Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006).

### C. EVIDENTIARY SUFFICIENCY IN THIS CASE

The trial court found that Moter's emails constituted computer harassment under Code § 18.2-152.7:1. We believe a rational factfinder could easily come to that conclusion. Moter's emails express "an appeal to the prurient interest in sex" and include multiple "shameful" sexual suggestions that go "substantially beyond customary limits" as these terms are used in Code § 18.2-352. Many of his emails make a "suggestion or proposal" of an obscene nature, and several implicitly threaten "illegal or immoral" acts. Code § 18.2-152.7:1.

We think so, not merely because of the literal text of each of the emails, but because of the long and tortuous context in which Moter communicated them. At the time of these specific offenses, C.V. had *already* been victimized by Moter on multiple occasions over several years. Moter twice pled guilty to stalking C.V. He threatened to stab her, scratched her car with profanities, wrote similar profanities on her neighborhood stop sign, and sent multiple messages laced with profane vulgarities. See App. at 121.

It was in this sordid context that Moter reinitiated contact with C.V. in 2010 with a torrent of more than forty messages over just a few days.  Nearly all of the messages repeated Moter's prurient appeals to sex and asserted his persistent, but false, claim that he and C.V. had been sexual partners.  Underlying this false claim was an implied threat:  If C.V. did not apologize for refusing to acknowledge their sexual relationship and thereafter express her willingness to continue it, she would pay a price.

The implication underlying Moter's messages was unmistakable:  He talked about having his "cock rubbed by [C.V.] and rubbed on [her] puss," id. at 130, 394 (November 22), and told her, "[Y]ou ought to beg me to suck my dick," id. at 407 (November 23).  He followed up with: "Stalk that.  Bitch."  Id. at 141, 412 (November 23).  "Death Cab for Cutie for REAL."  Id. at 413 (November 23) (capitalization in original).  "You lucky, [C.V.] THAT i AM NOT A VINDICTIVE PSYCHO WHO IS OUTSIDE your window right now ready to take revenge on you."  Id. at 423 (November 24) (capitalization in original).

In short, given Moter's prior offenses against C.V., his November 2010 messages cannot be explained away as anything other than a torrent of harassing obscenities and deranged threats of harm.

### III.

Ample evidence supports the trial court's finding that Moter was guilty of computer harassment under Code § 18.2-152.7:1.  We thus affirm his convictions and the accompanying revocation of the suspension on his earlier felony sentence.

Affirmed.