UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Russell, Ortiz and Raphael
Argued at Richmond, Virginia

VINSON L. HOLMES, JR.

v.        Record No. 0951-21-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE STUART A. RAPHAEL
JUNE 7, 2022

FROM THE CIRCUIT COURT OF KING WILLIAM COUNTY
B. Elliott Bondurant, Judge

Charles E. Haden for appellant.

Rebecca M. Garcia, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted appellant, Vinson L. Holmes, Jr., of abduction, aggravated malicious

wounding, conspiracy to commit robbery, two counts of robbery, two counts of malicious

wounding, and six counts of using a firearm in the commission of a felony.  Holmes claims that

the abduction conviction should be reversed because the facts supporting it were not separate and

distinct from those supporting the malicious wounding and robbery convictions.  He claims that

the conspiracy-to-commit-robbery conviction should be reversed for lack of evidence of any

agreement.  And he claims that all thirteen convictions should be set aside because the evidence

did not show that he willingly participated in the offenses or aided and abetted them.  Finding the

evidence sufficient for the jury to convict Holmes on all charges, we affirm.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

On the night of July 10, 2019, Holmes and Damian Kelley participated in two separate attacks on three victims at their homes in King William County. All thirteen convictions stem from those two incidents.

The first attack occurred at about 9:45 p.m., as Kristopher Eiben arrived at his house on Rosebud Run. As Eiben parked his car, he saw the head of a person later identified as Kelley standing by the shed. When Eiben got out of his car, he saw a second person later identified as Holmes standing about three feet behind Kelley. Eiben asked if he could help them with anything.

Kelley then approached, pointing a gun at Eiben and ordering him to the ground. Eiben went to his hands and knees, "keeping an eye on" his assailants. Eiben then dropped all the way to the ground. Although he covered his head with his arms, Eiben saw that Kelley was standing to his right and Holmes to his left. They attacked him. Eiben felt kicks to his right side and a stomp to his head. He also felt kicks to his ribs on the left side of his body and to his ear. He suffered blows to both sides simultaneously. The kicks coming from the left were more intense than those from the right.

Once the beating stopped, Kelley and Holmes fled on foot. Eiben ran to his house and called the police. He suffered visible injuries to his head and torso.

Sergeants Wade Ellis and M.P. Boyle of the King William County Sheriff's Office were dispatched to Eiben's home between 9:50 and 10:00 p.m. Eiben provided them with video footage from his shed-mounted security camera that showed Kelley and Holmes as they crossed in front of the lens. Kelley walked briskly with his right arm fully extended, his right hand pointing a gun straight ahead; Holmes kept up with him, only one stride behind. The camera also captured their fleeing the scene a short time later. Holmes could be seen well enough on the video that the officers took a still image to use in locating him.

The second attack occurred just after 10:00 p.m. at a residence on Corann Drive, a short distance from Eiben's home. Daniel Ingram and William Dean were relaxing and drinking beer in the garage of the house they shared. Holmes walked up the driveway to the garage—with Kelley behind him—and asked to borrow jumper cables. Ingram agreed to help and got the cables from his truck. Ingram did not see a car nearby, however, and the situation made him nervous. He began retreating to his truck. At that point, Kelley and Holmes "spread out a little." Kelley pulled out a gun, ordered Ingram and Dean to the ground, and threatened to shoot them both in the head.

Ingram and Dean complied, dropping to the ground. Each was then attacked, Ingram by Holmes and Dean by Kelley.

Holmes kicked Ingram in the face. Holmes tried to kick him again, but Ingram blocked the blow and rolled under a truck. Holmes then grabbed the wallet out of Ingram's back pocket. As Ingram tried to get up to get a shotgun, Holmes kicked him again on the side of his face.

As Holmes was assaulting Ingram, Kelley repeatedly kicked Dean in the face and ribs. Kelley broke off the attack only briefly to help Holmes subdue Ingram. Kelley struck Ingram with a hard object—Ingram thought it was the gun. The blow knocked Ingram unconscious and caused his body to tumble into the woods.

When Kelley joined Holmes to beat up Ingram, Dean got up to retrieve his shotgun. He didn't reach it. Once Ingram was knocked out, Kelley and Holmes jointly attacked Dean. They pushed Dean to the ground, beating and kicking him from "head to toe." During the assault, one of them hit Dean with a hard object; Dean thought it was a gun. The blow knocked him unconscious. After the attack, Dean's wallet was missing from his back pocket.

As Ingram regained consciousness, he heard two things: footsteps running down the driveway; and Dean screaming in agony. Dean was lying in a large pool of blood.

While still investigating the first attack at Eiben's residence on Rosebud Run, Sergeant Boyle got the call for assistance needed at the Corann Drive address. It took him less than a minute to drive there. He found blood everywhere and testified that Dean's face was "unrecognizable." Emergency medical personnel transported Dean to the hospital. Dean suffered fractures to his ribs, jaw, nose, and orbital bones. The attack rendered him permanently blind in his right eye. Although Ingram's injuries were less severe than Dean's, Ingram suffered bruises, swelling, and cuts on his face.

Searching for the assailants, Boyle left the Corann Drive home on foot with a canine tracking unit. The dog led him back to Rosebud Run. But as Boyle and the dog were returning to Corann Drive, Boyle noticed a motion-activated light that had illuminated behind a residence at 333 Oak Springs Drive, where he saw individuals running from the garage. The Oak Springs residence was situated in between the victims' homes on Corann Drive and Rosebud Run.

When Boyle approached the Oak Springs residence, he found a female sitting on the garage floor. A black pistol lay on the floor behind her. At Boyle's command, the female moved away from the pistol, which turned out to be a pellet gun.

Captain Michael Hamm interviewed the female—Holmes's girlfriend, Haley Johnson—at 1:00 a.m. at the Oak Springs residence. Hamm also collected a blue backpack from the

garage. The backpack contained the wallets of Ingram and Dean, as well as their IDs, bank cards, and many other documents belonging to them. A camera containing a photograph of Holmes was also found inside the backpack.

Hamm conducted a recorded interview of Holmes two days later. Holmes admitted that he was with Kelley on the night of July 10 but denied that he participated in the crimes against Eiben, Dean, and Ingram. Holmes said that Kelley had the gun, which belonged to Holmes's girlfriend, Johnson. Holmes claimed that he did not know what Kelley was going to do that night. Holmes said he was angry that Kelley had dragged him into that "nonsense." He claimed that he asked Ingram and Dean for the jumper cables because he had seen some people with car trouble and wanted to help them. Holmes said he ran from the police at the Oak Springs home because he was scared.

At trial, Holmes testified that he was with Kelley—his cousin—on the night of the attacks. Holmes said he was wanted by the police and had "nowhere else to go," so he went to Kelley's house. After drinking alcohol and smoking marijuana with two other people, Holmes and Kelley set out on foot in the neighborhood. Holmes claimed that he and Kelley never discussed committing any crimes. Holmes said that he thought they were going to a store and that he simply followed Kelley to the Rosebud Run residence. He said he did not know that Kelley was armed and was surprised when Kelley pulled out the gun and confronted Eiben. Holmes claimed that Kelley alone kicked Eiben. He said that he told Kelley to stop, tried to push Kelley away from Eiben, and then ran away.

Holmes also said that, after leaving Eiben's home, he confronted Kelley about what had just happened. Holmes wanted to go back to Kelley's house but said he did not know the way. He described Kelley as "crazy, angry, [and] disturbed."

- 5 -

Holmes claimed at trial—contrary to what he told Captain Hamm—that he wanted jumper cables so he could steal Kelley's mother's car. He added that he planned to steal the jumper cables too. Holmes claimed surprise when Kelley pulled out the gun and ordered Dean and Ingram to the ground. Holmes said that he was angry with Kelley for getting him into trouble. Holmes claimed that he "scuffled" with Ingram only after Ingram "charged at" him.

Holmes admitted punching Ingram in the face but denied kicking him. Holmes denied that he planned to rob the two men, that he kicked Dean, and that he took any wallets. He claimed not to know how the victims' wallets got into his backpack. Holmes acknowledged telling "quite a few lies" to Investigator Hamm. He admitted his felon status but could not remember how many felony convictions he had. He admitted his felony convictions for grand larceny, hit and run, and brandishing a firearm.

At the conclusion of the Commonwealth's evidence, the trial court granted Holmes's motion to strike the abduction and related firearm charges as to Ingram and Eiben. The court denied the motion to strike the abduction charge as to Dean, finding that Ingram was able to "roll away" from the initial attack by Holmes, whereas Dean was kept on the ground before being beaten. At the conclusion of all the evidence, the jury convicted Holmes of thirteen charges: aggravated malicious wounding of Dean, malicious wounding of Eiben and Ingram, abduction of Dean, robbery of Ingram and Dean, conspiracy to commit robbery, and six counts of using a firearm in the commission of a felony. The trial court imposed a total sentence of sixty-four years. The court suspended thirty years and six months, conditioned on good behavior and five years' supervised probation upon Holmes's release from prison.

ANALYSIS

Holmes's single assignment of error raises three separate challenges. First, he claims that he should not have been convicted of abducting Dean because, he says, any abduction or

detention was part of the acts of robbery and malicious wounding for which he was separately convicted. Second, he seeks to vacate his conviction for conspiracy to commit robbery, arguing there was no evidence that he agreed with Kelley to rob anyone. And third, he says that all thirteen convictions should be set aside for lack of evidence that he willingly participated in the offenses or aided or abetted Kelley in doing so.

When reviewing a sufficiency challenge, "[a]n appellate court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Cady*, 300 Va. at 329 (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "Instead, the only 'relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

### A. *The evidence sufficed to convict Holmes of abducting Dean.*

A defendant commits the crime of abduction if he, "by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty." Code § 18.2-47(A). Holmes claims that he should not have been convicted of abducting Dean because, "to the extent any physical restraint of . . . Dean took place," it occurred "during the commission of the acts of malicious wounding and robbery" and "constituted a restraint inherent in the act of committing those offenses."

To be sure, "the General Assembly 'did not intend to make the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault a criminal act, punishable as a separate offense.'" *Vay v. Commonwealth*, 67 Va. App. 236, 250 (2017) (quoting *Hoyt v. Commonwealth*, 44 Va. App. 489, 492 (2004)). "Rather, for abduction to be punishable as a

separate offense, the detention must be 'separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime.'" *Id.* (quoting *Brown v. Commonwealth*, 230 Va. 310, 314 (1985)). In determining whether detention was merely incidental to another crime, a court considers various factors, including the detention's duration, whether it occurred during the commission of a separate offense, and whether its purpose was to avoid detection. *See Hoyt*, 44 Va. App. at 494-95. But the central question "is whether any detention exceeded the minimum necessary to complete the required elements of the other offense." *Lawlor v. Commonwealth*, 285 Va. 187, 225 (2013). We focus "not on whether the restraint was merely useful to perpetrating a detention-plus crime—but whether the restraint was 'intrinsic' to . . . or 'inherent' in . . . the detention-plus crime." *Pryor v. Commonwealth*, 48 Va. App. 1, 6 (2006) (citations omitted).

"Whether an abduction is merely incidental to another crime is a question of law" that we review *de novo*. *Hoyt*, 44 Va. App. at 496 n.4. But "because no two crimes are exactly alike, determining whether an abduction is incidental necessarily requires consideration of the historical facts of each case." *Id.* So we must determine here what actions were necessary for Holmes to complete the offenses of robbery and aggravated malicious wounding of Dean. To do so, we necessarily turn to the elements of those offenses.

Robbery is the "taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Jones v. Commonwealth*, 70 Va. App. 307, 316-17 (2019) (*en banc*) (quoting *Jay v. Commonwealth*, 275 Va. 510, 524 (2008)). "[A]n abduction generally inheres in a robbery because 'there is usually some detention, and often a seizure, of the victim'" to accomplish the taking. *Wiggins v. Commonwealth*, 47 Va. App. 173, 180 (2005) (quoting *Scott v. Commonwealth*, 228 Va. 519, 526 (1984)). Malicious wounding is a Class 2 felony if the accused maliciously causes bodily

injury to another "with the intent to maim, disfigure, disable or kill" and the victim is "severely injured and is caused to suffer permanent and significant physical impairment." Code § 18.2-51.2(A).

The evidence showed that Dean was detained on the ground by force or intimidation in two instances. First, after Holmes approached Dean and Ingram, claiming to need jumper cables, Holmes and Kelley fanned out from one another; Kelley pulled out a gun and ordered Dean and Ingram to the ground, threatening to shoot them; and Dean complied. Dean was thus detained on the ground by the threat of force. At that point, neither a robbery nor malicious wounding had been committed against him. So the detention was not incidental to any of the later crimes against Dean.[1]

The second instance occurred when Dean tried to get up (after Kelley left him momentarily to help Holmes subdue Ingram), and Kelley and Holmes forced Dean to the ground again. Holmes and Kelley then violently beat and kicked Dean, blinding him in one eye and rendering him unconscious. Those severe injuries were inflicted after Dean was already on the ground. And it was only later that Dean discovered that his wallet had been stolen; there was no evidence that he was robbed before losing consciousness.

In other words, Holmes and Kelley detained Dean against his will with acts of force and intimidation separate from, and not merely incidental to, the robbery and malicious wounding

---

[1] Although Holmes was not the one who detained Dean on the ground in the first instance, he was liable for Kelley's actions as a principal in the second degree. "A principal in the second degree . . . is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005) (quoting *Jones v. Commonwealth*, 208 Va. 370, 372 (1967)). A "principal in the second degree may be indicted, tried, convicted and punished as if a principal in the first degree." *Allard v. Commonwealth*, 24 Va. App. 57, 62 (1997). "A person assisting his confederate to commit a crime is accountable for all crimes committed by the confederate in furtherance of the criminal enterprise . . . ." *Owens v. Commonwealth*, 54 Va. App. 99, 104 (2009) (quoting *Jones v. Commonwealth*, 15 Va. App. 384, 387 (1992)).

that followed. Both instances of detention forced Dean to the ground and thus "exceeded the minimum necessary to complete" the later acts of robbery and aggravated malicious wounding. *Lawlor*, 285 Va. at 225. Although the second detention resulted in Dean's being knocked unconscious, that does not make the abduction part and parcel of the robbery and malicious wounding. Just as "[r]endering one's victim unconscious is not an essential, intrinsic element to complete the offense of rape," *id.* at 226, neither is it an essential, intrinsic element of robbery and malicious wounding. And even assuming for argument's sake that the second instance of detention presented a closer call than the first—given that the robbery and malicious wounding followed on its heels—the first instance of detention was alone sufficient to support the abduction conviction.[2]

B. *The evidence was sufficient to convict Holmes of conspiracy to commit robbery.*

Holmes also challenges the sufficiency of the evidence to sustain his conviction for conspiracy to commit robbery, claiming that the Commonwealth failed to prove an agreement between him and Kelley. We disagree.

"To prove a conspiracy, the Commonwealth must offer evidence of 'an agreement between two or more persons by some concerted action to commit an offense.'" *James v. Commonwealth*, 53 Va. App. 671, 677-78 (2009) (quoting *Wright v. Commonwealth*, 224 Va. 502, 506 (1982)); *see also* Code § 18.2-22 (proscribing conspiracy to commit a felony). "It is a

---

[2] Holmes does not assign error to any inconsistency in the trial court's decision granting the motion to strike the abduction charge as to Ingram but not as to Dean. The trial court found the two victims' situations "a little different." Ingram was able to "roll away" when he was first ordered to the ground. Dean, by contrast, was "ordered to the ground," then "beaten," then "detained again," and then "beaten" while "trying to get up." That distinction is rational, suggesting that, in the trial court's view, the abduction charge as to Dean was evidenced by sufficient control over Dean where the abduction charge as to Ingram was not. *See, e.g.*, *Walker v. Commonwealth*, 74 Va. App. 475, 490 (2022) (noting that, by adopting the abduction statute, "the General Assembly focused on *control over* the victim as opposed to mere *movement of* the victim").

rare case where any 'formal agreement among alleged conspirators' can be established." *James*, 53 Va. App. at 678 (quoting *Wilder Enter. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1141 (4th Cir. 1980)).  But "[t]he existence of a conspiracy may be proven by circumstantial evidence."  *Chambliss v. Commonwealth*, 62 Va. App. 459, 466-67 (2013).  Because conspirators often perform different roles in pursuit of their criminal plan, when the Commonwealth proves that the conspirators "by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment, the [factfinder] will be justified in concluding that they were engaged in a conspiracy to effect that object."  *James*, 53 Va. App. at 678 (alteration in original) (emphases omitted) (quoting *Charity v. Commonwealth*, 49 Va. App. 581, 586 (2007)).

Holmes maintains that the Commonwealth failed to exclude the reasonable hypothesis of innocence that Kelley spontaneously decided to rob Ingram and Dean without Holmes's agreement.  When assessing whether the circumstantial evidence excludes a reasonable hypothesis of innocence, the Commonwealth "need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant."  *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011) (quoting *Hamilton v. Commonwealth*, 16 Va. App. 751, 755 (1993)).  "The reasonable-hypothesis principle . . . is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'"  *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).  "[T]he factfinder determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant."  *Id.*  "Whether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly

wrong." *Holloway v. Commonwealth*, 57 Va. App. 658, 666 (2011) (*en banc*) (quoting *Archer v. Commonwealth*, 26 Va. App. 1, 12-13 (1997)).

In convicting Holmes of conspiracy to commit robbery, the jury rejected Holmes's testimony that he had no knowledge that Kelley would pull out a gun to rob Ingram and Dean. "The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010). "When 'credibility issues have been resolved by the jury in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). The jury was also permitted to consider Holmes's prior felony convictions in assessing his credibility. *See* Code § 19.2-269.

The jury could properly find from the evidence, taken in the light most favorable to the Commonwealth, that Holmes and Kelley planned to rob Ingram and Dean. Holmes and Kelley each performed a role. Holmes led the way up the driveway, offering the ruse that he needed to borrow jumper cables. When Ingram agreed and got the cables from his truck, Holmes and Kelley spread apart, making Ingram suspicious and nervous about their intentions. Kelley then pulled out a gun and ordered both victims to the ground. Holmes immediately attacked Ingram while Kelley attacked Dean. When Dean tried to get up, Holmes and Kelley together went to Dean, forcing him to the ground. They jointly beat and kicked him, inflicting severe and permanent injuries. Dean's face was "unrecognizable" after the attack, and he was blinded in

one eye.  And both victims' wallets and personal items were later found in a backpack that Holmes admitted was his.

   C.  *The evidence sufficed to show Holmes's willing participation in all thirteen crimes.*

   Holmes claims that the Commonwealth's evidence failed to prove that he "willingly participated" or "otherwise aided and abetted" the thirteen crimes of which he was convicted. He points to his trial testimony denying knowledge that Kelley would commit robbery and denying that he took the wallets found in his backpack.

   But it was for the jury to decide "which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by [the] defendant."  *Moseley*, 293 Va. at 464.  The factfinder "has the sole responsibility to determine . . . credibility . . . and the inferences to be drawn from proven facts."  *Hamilton*, 279 Va. at 105. What is more, the jury was "at liberty to discount [the appellant]'s self-serving statements as little more than lying to 'conceal his guilt,' and could treat such prevarications as 'affirmative evidence of guilt.'"  *Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008) (first quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 10 (2004); then quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

   We cannot disturb the jury's credibility findings unless "plainly wrong."  *Towler*, 59 Va. App. at 291.  The jury was entitled to disbelieve Holmes's self-serving testimony and instead credit the testimony of Eiben, Ingram, and Dean and the physical evidence that corroborated their accounts.  All three victims testified that Holmes actively participated in the crimes against them.  The video from Eiben's security system showed Kelley in the lead, his right arm extended and his right hand pointing the gun straight ahead, and Holmes following one stride behind. Eiben testified that he was kicked on both sides of his body simultaneously and that the blows to his left side—where Holmes was standing—were more vicious.

For the second attack, Holmes led the way up the driveway and lied to the victims about needing to borrow jumper cables. Holmes viciously kicked Ingram at multiple points throughout the attack. Ingram identified Holmes as the one who stole his wallet. And the police found wallets belonging to Ingram and Dean in Holmes's backpack.

Thus, the jury could properly find beyond a reasonable doubt that Holmes actively participated in each of the crimes for which it found him guilty.

CONCLUSION

We see no basis to set aside any of Holmes's thirteen convictions. While we affirm the judgment below, we remand for the limited purpose of correcting a clerical error.[3]

*Affirmed and remanded.*

---

[3] Holmes was indicted under Code § 18.2-51 for the malicious wounding of Eiben and was convicted "as charged in the indictment." But the conviction and sentencing orders instead identify Code § 18.2-51.2, the statute for *aggravated* malicious wounding. Holmes received the proper sentence for malicious wounding under Code § 18.2-51. We thus remand for the conviction and sentencing orders to be corrected to reflect that Holmes was convicted of violating Code § 18.2-51 in the case identified below as CR19-40(02). *See Green v. Commonwealth*, 72 Va. App. 193, 205 & n.8 (2020).