COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Kelsey and Senior Judge Willis
Argued at Chesapeake, Virginia

DARIUS T. JAMES, S/K/A
   DARIUS TREMAYNE JAMES

                                                             OPINION BY
v.        Record No. 2335-06-1                    JUDGE D. ARTHUR KELSEY
                                                             MARCH 31, 2009
COMMONWEALTH OF VIRGINIA


                  FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                                    A. Joseph Canada, Jr., Judge

                  Suzanne Moushegian, Senior Assistant Public Defender (Office of
                  the Public Defender, on brief), for appellant.

                  Gregory W. Franklin, Assistant Attorney General (Robert F.
                  McDonnell, Attorney General, on brief), for appellee.


        The trial court convicted Darius T. James of conspiracy to commit robbery in violation of

Code §§ 18.2-58 and 18.2-22.  On appeal, James challenges the sufficiency of the evidence used

to convict him.  Finding the evidence sufficient, we affirm.[1]

                                                    I.

        On appeal, we review the evidence in the "light most favorable" to the Commonwealth.

Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003).  This principle

requires us to "discard the evidence of the accused in conflict with that of the Commonwealth,

and regard as true all the credible evidence favorable to the Commonwealth and all fair

inferences to be drawn therefrom."  Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755,

759 (1980) (emphasis and citation omitted).

---

        [1] Earlier in these proceedings, the Virginia Supreme Court vacated James's convictions
for attempted robbery and the attempted use of a firearm.  Jay v. Commonwealth, 275 Va. 510,
659 S.E.2d 311 (2008).  The case returns to us on remand to consider James's challenge to the
sufficiency of the evidence for the conspiracy conviction.

The evidence at trial showed that Detective Riya Sloan was working undercover in a drug investigation. During telephone conversations, Sloan arranged to purchase marijuana from James. Sloan and James agreed not to bring anyone else to the pre-arranged location. For protection, however, another undercover detective secretly accompanied Sloan to the location. After a phone conversation, James parked his SUV near Sloan's car, and Sloan gestured for James to come to her car. James refused and demanded that Sloan come to his SUV.

Sloan went to the driver's side of James's SUV and asked to see the marijuana. James declined to show her marijuana, but said he would show it to her if she got into his SUV. Sloan refused. Instead, she walked to the passenger side and spoke to James through an open window. James continued to demand that Sloan get into his SUV, and she repeatedly refused. Police officers listening to the conversation between Sloan and James became concerned and converged on the scene. When officers ordered James from the SUV, an unloaded handgun fell from James's waistband. One of the officers then found Joshua Mitchell under some clothing in the rear of the SUV. They also discovered a handgun magazine containing bullets in the area where Mitchell was hiding. The magazine matched the handgun that James dropped.

At the police station, James gave a statement. He said the drug sale was a ruse. He intended to "take her money." "If she was going to give it to me," James stated, "I was going to apply no force." His main plan was to simply "intimidate her." As he explained it, "she was going to see *two dudes* and be scared" because "the game plan was to scare her." If she handed over the money, "Mitchell was going to stay there." If not, "Mitchell was going to scare her." James said "that it was *two guys* against a girl and he figured she'd be scared." As for the firearm, James initially admitted "he was going to show the gun and use it" to get Sloan to give up the money. He later denied this intent. He agreed, however, that "the *two of them* were going to scare the girl and take her money."

Taking the stand in his own defense, James admitted the firearm was his. He said he assumed Mitchell "knew fully what was going on." Mitchell was in the room when James set up the fake drug deal with Sloan. Mitchell knew James had no marijuana to sell. Mitchell hid in the backseat of the SUV hoping Sloan would not see him. If "something was going wrong," James believed, Mitchell "would jump out or something." James admitted he told police the firearm would be used, but said he later recanted that statement.

On cross-examination, James admitted he intended to "take the money" from Sloan "by force." That was his "intention throughout." He put his "plans into action" with the intent to "rob her." Mitchell observed James retrieve a firearm. James drove to the deal location with his "gun concealed in [his] waistband." Mitchell was with him "that whole time." En route to the planned robbery, Mitchell was initially in the front passenger seat but James ordered him to conceal himself in the backseat. James removed the magazine from the firearm and "threw the clip to [his] *partner* in the back." When asked if he "assumed that [Mitchell] would jump out," James answered "Yes."

During direct, cross, and redirect testimony, James sought to minimize (and sometimes outright deny) earlier admissions he made to the police and from the witness stand. Though he agreed he intended "to rob her" by himself, James attempted to discount any conspiratorial intent to include Mitchell in the planned robbery. Sitting as factfinder, the trial court found the evidence proved James and Mitchell conspired together for the purpose of robbing Sloan. James now appeals, claiming the evidence fails as a matter of law to prove him guilty of conspiracy to commit robbery.

II.

Faced with a challenge to the sufficiency of the evidence, "we must give trial courts and juries the wide discretion to which a living record, as distinguished from a printed record,

- 3 -

logically entitles them. The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them." Bradley v. Commonwealth, 196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955). In bench trials, the "trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004) (citation omitted).

Consequently, a reviewing court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original, citation omitted). Instead, we ask only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson, 443 U.S. at 319) (emphasis in original). These principles recognize that appellate courts are "not permitted to reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), because we have no authority "to preside *de novo* over a second trial," Haskins, 44 Va. App. at 11, 602 S.E.2d at 407.

III.

To prove a conspiracy, the Commonwealth must offer evidence of "an agreement between two or more persons by some concerted action to commit an offense." Wright v. Commonwealth, 224 Va. 502, 506, 297 S.E.2d 711, 713 (1982); Williams v. Commonwealth, 53 Va. App. 50, 59-60, 669 S.E.2d 354, 358 (2008) (citation omitted). In simplest terms, as Justice Holmes put it, a "conspiracy is a partnership in criminal purposes." United States v. Kissel, 218 U.S. 601, 608 (1910). Because most conspiracies are "clandestine in nature," 2 Wayne R. LaFave, Substantive Criminal Law § 12.2(a), at 266 (2d ed. 2003), by "the very nature of the

offense, it often may be established only by indirect and circumstantial evidence," <u>Wright</u>, 224 Va. at 505, 297 S.E.2d at 713 (quoting <u>Floyd v. Commonwealth</u>, 219 Va. 575, 580, 249 S.E.2d 171, 174 (1978)). It is a rare case where any "formal agreement among alleged conspirators" can be established. <u>Wilder Enter. v. Allied Artists Pictures Corp.</u>, 632 F.2d 1135, 1141 (4th Cir. 1980); <u>see</u> <u>also</u> <u>Combs v. Commonwealth</u>, 30 Va. App. 802, 810, 520 S.E.2d 400, 404 (1999) (holding that proof of an "explicit agreement is not required").

As often as not, conspirators play different roles in the criminal plan. Thus, when "it has been shown that the defendants 'by their acts *pursued the same object*, one performing *one part* and the others performing *another part* so as to complete it or with a view to its attainment, the [factfinder] will be justified in concluding that they were engaged in a conspiracy to effect that object.'" <u>Charity v. Commonwealth</u>, 49 Va. App. 581, 586, 643 S.E.2d 503, 505 (2007) (emphasis added and citation omitted). As a result, liability "as a conspirator is not dependent on knowledge of the entire scope of the conspiracy." <u>Amato v. Commonwealth</u>, 3 Va. App. 544, 552, 352 S.E.2d 4, 9 (1987) (citation omitted). "Knowledge need not extend to all the details of the conspiracy, the identity of the other conspirators, the part each member of the conspiracy is to play, or how the spoils of the conspiracy are to be divided." <u>Id.</u> (citation omitted).

Equally important, unlike an attempt crime, a conspiracy is "complete when the parties agree to commit an offense." <u>Gray v. Commonwealth</u>, 260 Va. 675, 680, 537 S.E.2d 862, 865 (2000). "No overt act in furtherance of the underlying crime is necessary." <u>Id.</u> That is, "[w]hen the parties *agree* to commit an offense, they have committed the crime of conspiracy, regardless of whether an act in furtherance of the underlying crime has been performed." <u>Anderson v. Commonwealth</u>, 52 Va. App. 501, 509, 664 S.E.2d 514, 518 (2008) (emphasis in original).

The facts of this case fully support the trial court's ruling. At trial, James said he planned to "rob" Sloan — which, he admitted on cross-examination, meant he intended to "take the

money from her by force." That was his "intention throughout," James admitted. He put his "plans into action" with the intent to "rob her." [2] From that starting premise — James's admitted plan to rob Sloan — the trial court found as a fact that Mitchell agreed to participate in James's plan. From his own statements to police and his testimony at trial, James laid the factual groundwork for the conspiracy inference. James agreed that:

- The victim "was going to see *two dudes* and be scared" because "the *game plan* was to scare her." J.A. at 151.

- It would be "*two guys* against a girl and he figured she'd be scared." J.A. at 151.

- The "*two of them* were going to scare the girl and take her money." J.A. at 153.

- If she handed over the money "Mitchell was going to stay there." If not, "*Mitchell was going to scare her.*" J.A. at 151.

- Mitchell, James assumed, "*knew fully* what was going on." J.A. at 166.

- Mitchell was in the room when James set up the fake drug deal with Sloan. J.A. at 167.

- Mitchell knew James had no marijuana to sell. J.A. at 167.

- Mitchell hid in the back of the SUV so Sloan would not see him. J.A. at 167, 175.

- If "something was going wrong," James expected Mitchell "would jump out or something." J.A. at 168.

---

[2] At other times during his testimony, James attempted to recant those remarks (particularly when rehabilitated by defense counsel on redirect), but the trial court had no obligation to credit the recantation and discredit the confession. On appeal, "when 'faced with a record of historical facts that supports conflicting inferences,' a court reviewing the sufficiency of the evidence 'must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Harper v. Commonwealth, 49 Va. App. 517, 523, 642 S.E.2d 779, 782 (2007) (quoting Jackson, 443 U.S. at 326). "The power to segregate a witness's testimony into the believable, partly believable, or wholly unbelievable is an exercise of decisional discretion intrinsic to the factfinding task and essential to its proper performance." Id.; Coleman v. Commonwealth, 52 Va. App. 19, 22 n.1, 660 S.E.2d 687, 689 n.1 (2008).

- Mitchell observed James retrieve a firearm. James drove to the deal location with his "gun concealed in [his] waistband." Mitchell was with him "that whole time." J.A. at 174.

- En route to the planned robbery, Mitchell was initially in the front passenger seat but James ordered him to conceal himself in the backseat. J.A. at 176.

- James removed the magazine from the firearm and "threw the clip to [his] *partner* in the back." J.A. at 177.

- When asked if he "assumed that [Mitchell] would jump out," James answered, "Yes." J.A. at 180.

(Emphasis added.) In short, a rational factfinder could conclude beyond a reasonable doubt that James intended to rob Sloan and that Mitchell — his "partner" — agreed to help him do so.[3]

James argues our analysis is incomplete. Even if a rational factfinder could infer a conspiracy to rob, James contends, the factfinder could also have inferred the entire episode was just a series of coincidences betraying no agreed plan of criminality or, if a plan, only a mere conspiracy to obtain "money by false pretenses." Appellant's Br. at 14. This logical possibility, James concludes, renders the evidence in support of his conviction insufficient as a matter of law. We disagree.

Properly understood, "the reasonable-hypothesis principle is not a discrete rule unto itself." Haskins, 44 Va. App. at 8, 602 S.E.2d at 405. "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." Hudson, 265 Va. at 513, 578 S.E.2d at 785. Thus, the principle "does not add to the burden of proof placed upon the Commonwealth in a criminal case." Id. It merely "reiterates the standard applicable to every

---

[3] James also contends this analysis cannot be squared with the Virginia Supreme Court's analysis of the attempted robbery charge in Jay v. Commonwealth, 275 Va. 510, 659 S.E.2d 311 (2008). We disagree. Jay held only that the evidence did not prove a "direct overt act" necessary for the crime of attempted robbery. Id. at 526, 659 S.E.2d at 320. "No overt act in furtherance of the underlying crime is necessary" to prove conspiracy. Gray, 260 Va. at 680, 537 S.E.2d at 865.

criminal case." Pease v. Commonwealth, 39 Va. App. 342, 360, 573 S.E.2d 272, 280 (2002) (*en banc*) (citation and internal quotation marks omitted), aff'd, 266 Va. 397, 588 S.E.2d 149 (2003) (*per curiam* order adopting reasoning of the Court of Appeals).

Whether the hypothesis of innocence is reasonable is itself a "question of fact," subject to deferential appellate review. Haskins, 44 Va. App. at 9, 602 S.E.2d at 406 (citation omitted). "Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." Miles v. Commonwealth, 205 Va. 462, 467, 138 S.E.2d 22, 27 (1964). "By finding the defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" Haskins, 44 Va. App. at 9, 602 S.E.2d at 406 (citation omitted).

True, a factfinder "cannot 'arbitrarily' choose, as between two equally plausible interpretations, one that incriminates the defendant." Id. (citation omitted). The choice becomes *arbitrary*, however, only when "no rational factfinder" could believe the incriminating inferences and disbelieve the exculpatory inferences. Id. (citation omitted).[4] In other words, when examining an "alternate hypothesis of innocence in a circumstantial evidence case," the question is not whether "some evidence" supports the hypothesis, but whether a rational factfinder could have found the incriminating evidence renders the hypothesis of innocence unreasonable. Emerson v. Commonwealth, 43 Va. App. 263, 277, 597 S.E.2d 242, 249 (2004) (citing Hudson, 265 Va. at 513, 578 S.E.2d at 785).

---

[4] This deferential standard of review "applies not only to the historical facts themselves, but the inferences from those facts as well." Crowder v. Commonwealth, 41 Va. App. 658, 663 n.2, 588 S.E.2d 384, 387 n.2 (2003). Thus, a factfinder may "draw reasonable inferences from basic facts to ultimate facts," Haskins, 44 Va. App. at 10, 602 S.E.2d at 406 (citations omitted), unless doing so would push "into the realm of *non sequitur*," Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006) (citation omitted).

These principles apply to conspiracy cases no differently than any other.  To be sure, in

Wright, the Virginia Supreme Court summarized the point just this way:

> Defendants further argue that even if this is the case, there is
> insufficient evidence to show they had conspired to commit a
> robbery.  They argue it is *equally likely* they had set out to commit
> another felony or even a misdemeanor.  We do not agree.
>
> We have held in a number of cases that *the finder of fact may draw
> reasonable inferences that a defendant intended to commit one
> crime rather than another.*

Wright, 224 Va. at 505, 297 S.E.2d at 713 (emphasis added).

IV.

In sum, the evidence supports the trial court's finding that James conspired to commit

robbery in violation of Code §§ 18.2-58 and 18.2-22.  We thus affirm his conviction.

Affirmed.