COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Athey and Callins
Argued at Lexington, Virginia


DAVID LEE MORSE

MEMORANDUM OPINION* BY
v.        Record No. 0444-22-3                JUDGE MARY BENNETT MALVEAUX
MARCH 7, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRY COUNTY
David V. Williams, Judge

(Elmer Woodard, on brief), for appellant.  Appellant submitting on
brief.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


After a bench trial, the trial court convicted David Lee Morse ("appellant") of conspiracy to

commit first-degree murder, in violation of Code §§ 18.2-22 and -32, and first-degree murder as an

accessory before the fact, in violation of Code § 18.2-32.  On appeal, appellant asserts that the

evidence was insufficient to sustain his convictions.  For the following reasons, we affirm.

BACKGROUND

Just before 8:00 a.m. on May 13, 2020, appellant returned home from working a night shift

and found his wife Pamela Morse ("Pamela") shot to death in bed.  The autopsy confirmed that

Pamela died of two gunshot wounds to the head.  Forensic analysis by the Virginia Department

of Forensic Science ("DFS") established that the murder weapon was a Ruger magnum revolver.

Appellant and Pamela married in 2001.  In December 2019, appellant began an

extramarital affair with Tanna Fitzgerald.  Appellant and Pamela first met Fitzgerald several

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

years before at a local restaurant where Fitzgerald worked. To hide their relationship from Pamela, appellant and Fitzgerald met secretly at her residence or at an outbuilding on appellant's property. Appellant worked in law enforcement for twenty-five years for local sheriffs' departments but retired sometime before May 2020 and took a night shift job at Hanes Brand in Patrick County.

Around March 2020, Fitzgerald began demanding that appellant leave Pamela to be with her. On May 10, 2020, Fitzgerald stated in a text that "we are going to be together soon," and appellant replied, "Yes we are." On May 11, appellant texted Fitzgerald about a deck he was building at his residence. Fitzgerald replied, "Damn honey our porch is looking wonderful I like that," and "That is beautiful be glad when it's just yours." Appellant responded, "I LOVE YOU HONEY, COFFEE ON THE PORCH IN THE MORNING'S [sic]."

Appellant worked the night shift on the night of May 12 and morning of May 13, 2020. Before he left for work, Pamela asked him to pick up biscuits and gravy from Hardee's restaurant when he got off work the next morning. Beginning at 12:54 a.m. on May 13, while appellant was at work, he and Fitzgerald exchanged the following texts:

> Fitzgerald: How many cameras and where are they (12:54)
>
> Appellant: Not a problem, disarmed (1:04)
>
> Appellant: Unplugged (1:04)
>
> Fitzgerald: Is there any way possible that she could have went and plug[ged] them back in[?] (1:15)
>
> Appellant: No (1:34)
>
> Appellant: If you would rather wait, it's your call (1:35)
>
> Appellant: We'll do a diet sundrop, if you had rather wait (1:43)
>
> Fitzgerald: No can't change it now to[o] late I love you baby (1:44)

Appellant:  LOVE you Honey  (1:44)

Fitzgerald:  You['re] going to be ok baby  (1:45)

Appellant:  This is a sure thing right  (1:51)

Appellant:  Just saying, nothing else has worked  (1:52)

Fitzgerald:  Yes it is baby do you want to or not  (1:53)

Appellant:  If Ya'll don't want to take a chance with it, fix me up something  (1:54)

Fitzgerald:  We're good here  (1:54)

Appellant:  It's fine with me Honey, whatever Ya'll want to do (1:55)

Fitzgerald:  Done deal baby done deal I love you  (1:56)

Appellant:  Well  (3:35)

Fitzgerald:  Heading that way now baby I'll call you as soon as I pick then [sic] back up in about 45 mins to an hour DAVID, I LOVE YOU SO MUCH  (3:55)

Appellant:  They there now  (3:58)

Fitzgerald:  Not yet almost  (3:58)

Fitzgerald:  Do you still love me  (3:59)

Appellant:  LOVE YOU TO [sic] BABY  (3:59)

Appellant:  LOVE YOU  (4:02)

Fitzgerald:  We are good honey stop worrying you going to make yourself sick stop about this stop thinking about it for right now I got this  (4:47)

Appellant:  People are waking now.  Too late Baby already sick (4:48)

Fitzgerald:  Sorry baby already in progress  (5:08)

Fitzgerald:  Are you ok baby  (5:10)

Fitzgerald:  David are you ok  (5:13)

Appellant:  Yeah, I'm okay  (5:15)

Fitzgerald:  Thank goodness I LOVE YOU BABY  (5:15)

Fitzgerald:  Please don't hate me  (5:15)

Appellant:  No Honey, I'm just stressing out  (5:16)

Fitzgerald:  Me too but we will be so happy  (5:16)

Appellant:  Why wait until now  (5:17)

Fitzgerald:  What you mean that was them their time  (5:18)

Fitzgerald:  I don't know  (5:18)

Fitzgerald:  Took them there it's been an hour I don't see him you need to be careful when you go home I'll text you and let you know when I see him  (5:56)

Appellant:  Told you  (5:58)

Fitzgerald:  Told me what David  (5:58)

Fitzgerald:  So now you can put all the blame on me that's why you told me what don't start with that David it's both of us just wanting just me I told you earlier when you said the word yes or no that was the word and it won't no stopping it and I'm in it I don't know what happened I didn't get my phone number she left she lost her phone in my car he don't have my number I don't know where they're at but please be careful when you go home and yeah I'll take the blame for everything okay it's all good I knew it was going to happen  (6:04)

Fitzgerald:  You want me just to go on now and tell him I done it get it over with him before you get home so they can lock me up whatever cuz I'm going to get the blame for it anyway I see that coming to just you done telling me right (6:05)

Fitzgerald:  You just stay at work get off regular time do what you supposed to do don't think about nothing don't say nothing don't call nobody don't do nothing.  Just let me do what I got to do (6:09)

Appellant:  Don't do it Baby, don't do something stupid like that please, please  (6:10)

Fitzgerald:  You just stay at work get off regular time do what you supposed to do don't think about nothing don't say nothing don't call nobody don't do nothing.  Just let me do what I got to do (6:13)

Fitzgerald:  [T]hink about nothing don't say nothing don't call nobody don't do nothing.  Just let me do what I got to do  (6:34)

Fitzgerald:  I got her phone but can't get in it (6:40)

Appellant:  Ok  (6:42)

Fitzgerald:  So what do you want me to do  (6:44)

Appellant:  Just wait I guess, that's all I know to do.  I'm going by Hardee's like I planned and then go home  (6:46)

Fitzgerald:  Im so sorry please I beg you not to hate me.  I didn't want to lose you but I can't make you be with me cause I know it's all my fault and you will blame me but David I am sorry and I truly do love you with all my heart  (6:57)

Appellant:  LOVE you to[o] Honey  (6:57)

Fitzgerald:  Im so sorry and I will turn myself in and take all the blame it was all me just remember I LOVE YOU ALWAYS (6:59)

Fitzgerald:  Hey baby haven't heard from you this morning I just woke up give me a call when you can I love you  (9:48)

At 7:52 a.m., appellant called 911 and reported that he had returned home from work and found Pamela lying in bed with apparent gunshot wounds.  Multiple officers from the Henry County Sheriff's Office, including Sheriff Lane Perry, responded to appellant's residence. Appellant told the officers that "he thought the point of entry may have been" the rear door by the partially-constructed deck.  Appellant explained that he had unplugged the two security cameras facing the door by the carport several days earlier to charge Pamela's motorized wheelchair.  Appellant also had removed the batteries from an additional "game" camera facing the rear of the property.

- 5 -

While Investigator Everett Harper was speaking with appellant, appellant received a text and "turned the phone to his right" so that Harper "wouldn't see what was going on." Investigator Harper then "took possession" of appellant's cell phone, sealed it in an evidence envelope, and placed it in the temporary evidence vault at the scene. Appellant provided Harper with the phone's password.

Pamela's daughter Jennifer Helms went to the residence on the morning of May 13 after being informed of her mother's death. Helms testified that Pamela had numerous health problems, including mobility issues, bad shoulders, bad discs in her back, bad knees, a bad ankle, asthma, and allergies. According to Helms, appellant and Pamela had separate bedrooms, but Pamela typically slept in the recliner chair. Helms thus found it "odd" that appellant found Pamela in bed. Appellant told Helms that "they shot" Pamela and that the killer had "busted in" the back door. Helms did not "know how anyone would be able to get in that door" because Pamela kept an exercise bike and stacks of books by the door.

Although the Henry County officers preserved the scene, took photographs, and interviewed appellant, Sheriff Perry asked the Virginia State Police ("VSP") to take over the investigation because of appellant's past employment with the Sheriff's Office. VSP Special Agent Billy McCraw arrived at the home at 9:56 a.m. McCraw told appellant that he was not under arrest, and appellant voluntarily spoke with McCraw. Appellant stated that he last spoke with Pamela before he left for work the previous night. She told him that she was going to take a Tylenol and a muscle relaxer and go to sleep and asked him to pick up biscuits and gravy on his way home in the morning. Appellant called Pamela when he left work in the morning and after he picked up the biscuits; he stated that the fact she did not answer "was nothing unusual."

When appellant arrived home, he saw that his red Jeep SUV was missing. He found Pamela in bed and "knew that something was wrong" "when he saw her head." Appellant told

Special Agent McCraw that he had been "seeing" Fitzgerald but that he did not think that she "had anything to do with this."

VSP Special Agent William Odell, who knew appellant "fairly well," drove appellant to the Martinsville Police Station after appellant agreed to be interviewed there. During the ride, appellant asked if VSP would "do a search warrant for Facebook and text messages." When Odell responded that they would, appellant "hesitated a little bit" and said "good." Appellant then "hesitated a few more seconds" and said, "it's going to cause me a lot of trouble because after they read those they'll probably want to charge me with conspiracy or charge me with something."

When he arrived at the police station, appellant handwrote a three-page statement. Appellant stated that he and Fitzgerald "told each other that we loved each other and some day we would be together." He further stated that "as time went by [Fitzgerald] started pushing for" appellant to leave Pamela and "wanted that to happen very quickly." Appellant "just could not make that move," so Fitzgerald "kept telling [him] to make that move or she would make it for [him]." Fitzgerald threatened several times to "come to [appellant's] house and tell Pam herself if [he] couldn't," and that Fitzgerald "was going to make this happen one way or the other." Appellant did not take Fitzgerald seriously and "ignored the threats." Appellant stated that although the "situation continued to get worse," he was "[s]till not taking [Fitzgerald] seriously." On the night of May 13, 2020, Fitzgerald texted him that "she had someone that would take [care] of the problem." Appellant "knew at that point that she may be serious" but "didn't think she would actually go through [with] it." Appellant "told her not to, but she said it was too late."

VSP Special Agents Matthew Wade and Steve Oliver interviewed appellant for more than three hours after reading him his *Miranda*[1] rights. The interview was audio-recorded, and

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Special Agent Wade prepared a seventeen-page written summary.[2]  Appellant told the officers that he "want[ed] it straightened out," even though it would "bite [him] in the butt."  He explained that he had a "decent" relationship with Pamela but had begun a "physical" relationship with Fitzgerald in December 2019.  By the spring of 2020, Fitzgerald began demanding that appellant leave Pamela for her.  Appellant told Fitzgerald that he wanted to leave Pamela but told the officers that he never intended to do so and that he viewed his relationship with Fitzgerald as "strictly . . . physical."

He told the officers that Fitzgerald recently began speaking of "get[ting] rid" of Pamela.  Even though Fitzgerald mentioned getting rid of Pamela ten to fifteen times, appellant stated that he did not take those statements seriously.  He explained that Fitzgerald was "always talking [about] something, and it [was] hard to take her seriously."  Appellant believed that Fitzgerald was referring to his divorcing Pamela.  When Fitzgerald texted him that she "had someone to take care of the problem," and asked if he "want[ed] it done," he responded, "yeah."  Although Fitzgerald asked him multiple times whether he "want[ed] this to happen," he never thought she "was being serious."

Appellant stated that Fitzgerald's friends were "drug people" and that he believed her associates stole the Jeep.  Appellant told the officers both that Fitzgerald might claim that he was involved in Pamela's murder but also that Fitzgerald "love[d] [him] enough" to "tell the truth that [he] knew nothing about this."  Appellant "hop[ed]" that Fitzgerald would "turn[] over whoever did this."

VSP Special Agent Rick Conley testified that on the morning of May 13, 2020, he went to a location in Franklin County after Pamela's cell phone "pinged" a cell phone tower in that

---

[2] The Commonwealth did not play the audio recording at trial.  Special Agent Wade explained that appellant spoke in a "hushed tone," and therefore it was difficult to hear his voice on the recording.

area. While Conley and another officer searched the area for the missing Jeep, they saw a white pickup truck with two female occupants. The officers followed the truck to a residence on Holley Ridge Road. They found Fitzgerald, who was one of the women in the truck, in the yard with several other people. The officers "recover[ed]" Fitzgerald's cell phone, and she voluntarily gave them the password and permission to search the phone.

One of the residents told the officers that "the guy" and "the vehicle" that they were "looking for" were behind the residence. The officers located Collin Joshua Russell and Casey Rogers and arrested Russell for an outstanding probation violation. The officers seized multiple items on or near Russell's person, including a black revolver and a piece of paper with the handwritten words "Pamela Morse," "password," and "David." The officers subsequently found the Jeep in the woods behind the residence. Portions of the Jeep were spray-painted black. The Jeep was "cluttered" with property, including multiple items that appellant had identified as missing from the residence. Among these items were a television and a Winchester Magnum rifle and a box of ammunition. The officers found Pamela's insurance card in the woods and a box filled with multiple items belonging to appellant and Pamela in a shed.

Special Agent Wade returned to appellant's residence on May 14, 2020, and appellant agreed to speak with him. Appellant said that he was "nervous" and "scared" that Fitzgerald was going to come to his residence. Special Agent Wade interviewed appellant for more than an hour; they walked through the residence to allow appellant to further identify missing property. Special Agent Wade again audio-recorded the interview and prepared a detailed written summary.

Later that day, Special Agents Wade and Oliver interviewed Fitzgerald at the police station. After approximately an hour, Fitzgerald stated that she would not provide any more information until she spoke with appellant. Appellant reluctantly agreed to see Fitzgerald at the

station; appellant was "worried" that Fitzgerald "was probably going to want to hug him and kiss him and tell him that she loved him and he didn't want to do that because he didn't love her." When appellant saw Fitzgerald at the station, he told her to tell the investigators "everything." Appellant and Fitzgerald spent approximately fifteen minutes together with the officers; after appellant left, Fitzgerald spoke to the agents for another hour. Special Agent Wade video-recorded appellant and Fitzgerald's interaction and the remainder of Fitzgerald's interview on his cell phone, and the Commonwealth played a portion of the video at trial.

On May 15, 2020, VSP officers executed a search warrant at the Holley Ridge residence. The agents located and seized a Ruger magnum revolver in a box covered with leaves on the property. A DFS certificate of analysis confirmed that the Ruger was the weapon that killed Pamela. That same day Special Agent Wade returned to appellant's residence to check the electronic lock on the door leading into the home from the carport. Fitzgerald provided Special Agent Wade with a numerical code for the lock. Special Agent Wade verified that the lock was operational and that the code Fitzgerald provided opened the lock.

Testifying in his own behalf, appellant stated that he loved Pamela, did not want her to be murdered, and did not ask Fitzgerald to plan Pamela's murder. According to appellant, he and Pamela were both friends with Fitzgerald for years, and Pamela and Fitzgerald "got along great." He began a physical relationship with Fitzgerald in December 2019; by February or March 2020, he became concerned that Fitzgerald "[was] becoming obsessive." He testified that she began arriving at his home uninvited and following appellant and Pamela when they left the property. When appellant tried to "protest" or "distance" himself from Fitzgerald, he claimed that she became "very angry" and threatened to reveal the affair to Pamela.

Morse stated that during their relationship, he and Fitzgerald secretly met at an outbuilding on his property. He told Fitzgerald in January 2020 that he had removed the

batteries from the game camera at the rear of the property. Consistent with his statements to law enforcement officers, appellant testified that he had unplugged the security cameras facing the house three or four days before the murder to charge Pamela's wheelchair. Appellant stated that Fitzgerald had repeatedly offered to come to the residence while appellant was at work to help Pamela, but he declined. Fitzgerald asked appellant to give her the combination to the electronic lock in case she needed to help Pamela. Morse responded that she did not need the code because appellant and Pamela kept the back door unlocked. Appellant testified that he eventually gave Fitzgerald a code to the electronic lock "[b]ecause she was insistent on it." Appellant testified that he had "removed" the code that he gave Fitzgerald and thus believed that she could not use the code to enter the house. He acknowledged that Special Agent Wade successfully opened the electronic lock with that code on May 15, 2020.

On cross-examination, appellant stated that the references to "getting rid" of Pamela in his text conversations with Fitzgerald meant divorce or separation. He also testified that he did not take seriously Fitzgerald's statements that she had found someone to "take care" of the problem because she "made so many threats" that she did not carry out.

The trial court denied appellant's motions to strike and convicted him on both counts. This appeal followed.

ANALYSIS

On appeal, Morse challenges the sufficiency of the evidence. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204,

228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v. Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)). "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)).

Appellant contends that the Commonwealth's circumstantial evidence did not exclude the reasonable hypothesis of innocence that Fitzgerald plotted Pamela's murder with Russell and Rogers without his involvement or knowledge. We disagree.

"To prove a conspiracy, the Commonwealth must offer evidence of 'an agreement between two or more persons by some concerted action to commit an offense.'" *James v. Commonwealth*, 53 Va. App. 671, 677-78 (2009) (quoting *Wright v. Commonwealth*, 224 Va.

502, 506 (1982)).  To convict the defendant of conspiracy, as opposed to aiding or abetting, "the Commonwealth must prove 'the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting.'"  *Williams v. Commonwealth*, 53 Va. App. 50, 59-60 (2008) (quoting *Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988)).  "[T]he crime of conspiracy is complete when the parties agree to commit an offense; Virginia does not require proof of an overt act in furtherance of the conspiracy."  *Chambliss v. Commonwealth*, 62 Va. App. 459, 466 (2013).

"A conspiratorial agreement often may only be established by circumstantial and indirect evidence including the overt actions of the parties."  *Carr v. Commonwealth*, 69 Va. App. 106, 119 (2018) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 636 (2011)).  "It is a rare case where any 'formal agreement among alleged conspirators' can be established."  *James*, 53 Va. App. at 678 (quoting *Wilder Enter. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1141 (4th Cir. 1980)).

"In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree . . . ."  Code § 18.2-18.  To convict a defendant as an accessory before the fact, the Commonwealth must prove "'the commission of the crime by the principal, the accessory's absence at the commission of the offense, and that before the commission of the crime the accessory was "in some way . . . [a] contriver, instigator or advisor."'"  *Cirios v. Commonwealth*, 7 Va. App. 292, 298 (1988) (alterations in original) (quoting *McGhee v. Commonwealth*, 221 Va. 422, 425-26 (1980)).  The Commonwealth must show that the defendant "shared the criminal intent of the principal."  *Id.* (quoting *McGhee*, 221 Va. at 427).

Although the conspiracy is a distinct crime from the substantive murder offense, the same evidence supports both convictions.  "[C]ircumstantial evidence is competent and is entitled to as

much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (quoting *Pijor*, 294 Va. at 512). "When examining an alternate hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *Williams v. Commonwealth*, 71 Va. App. 462, 485 (2020) (quoting *Vasquez*, 291 Va. at 250). "The fact finder 'determines . . . whether to reject as unreasonable the hypotheses of innocence advanced by a defendant.'" *Young v. Commonwealth*, 70 Va. App. 646, 654 (2019) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017)). "Consequently, whether the evidence excludes all reasonable hypotheses of innocence is a 'question of fact,' and like any other factual finding, it is subject to 'revers[al] on appeal only if plainly wrong.'" *Id.* (alteration in original) (quoting *Thorne v. Commonwealth*, 66 Va. App. 248, 254 (2016)).

Here, in the days before the murder, appellant gave Fitzgerald the code to the electronic lock and disabled all the security cameras at the residence. These actions both facilitated the murder and are circumstantial evidence of appellant's criminal intent and participation in the conspiracy. Appellant offered innocent explanations for these actions; however, the trier of fact was not required to credit these self-serving explanations. Indeed, having rejected a defendant's attempted explanation as untrue, the fact-finder was entitled to "draw the reasonable inference that his explanation was made falsely in an effort to conceal his guilt." *Covil v. Commonwealth*, 268 Va. 692, 696 (2004). Moreover, appellant's text exchange with Fitzgerald in the early hours of May 13, 2020, strongly supports the finding that appellant had knowledge of and participated in the plot to murder Pamela.

- 14 -

Appellant also posits a hypothesis of innocence regarding the texts, namely that throughout the exchange, he believed that Fitzgerald was going to his residence not to murder Pamela, but to expose the affair. But a rational fact-finder viewing the texts in the light most favorable to the Commonwealth could reject that hypothesis as unreasonable. Fitzgerald opened the exchange by asking about cameras, and appellant responded that the cameras were "[n]ot a problem" because he unplugged them. Appellant's text asking whether "they" were "there now" also demonstrates his knowledge that people other than Fitzgerald were going to his residence. These texts do not support appellant's hypothesis that he believed Fitzgerald was going to his home to reveal the affair.

Further, at 6:04 a.m., Fitzgerald told appellant that she would "take the blame for everything," and at 6:05 she stated that "they can lock me up whatever cuz I'm going to get the blame for it anyway." Appellant did not express any surprise or confusion to Fitzgerald's references to taking the blame and being "lock[ed] up." To the contrary, he told her not to confess to the murder and reaffirmed his love for her. A rational fact-finder viewing the texts and all the other evidence in the light most favorable to the Commonwealth could reject appellant's claim of innocence and conclude that he conspired with Fitzgerald to murder Pamela and acted as an accessory before the fact to the killing by disabling the cameras and providing Fitzgerald with the electronic lock code.

## CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

*Affirmed.*

- 15 -