UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges AtLee, Malveaux and Causey
Argued at Norfolk, Virginia


BRIAN DAVID CROCKETT

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1947-22-1                      JUDGE RICHARD Y. ATLEE, JR.
                                                    MAY 21, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
AND COUNTY OF JAMES CITY
Charles J. Maxfield, Judge Designate

Ivan D. Fehrenbach (Dansby & Fehrenbach, on brief), for appellant.

Andrew T. Hull, Assistant Attorney General (Jason S. Miyares,
Attorney General; Rebecca M. Garcia, Assistant Attorney General,
on brief), for appellee.


Brian David Crockett appeals two convictions for conspiracy to deliver a controlled

substance to an inmate, in violation of Code § 18.2-474.1.  Crockett contends that the evidence

failed to exclude the reasonable hypothesis of innocence that he was an unwitting recipient of the

mail containing the controlled substance in question, and therefore it was insufficient to prove that

he willfully participated in a conspiracy.  Finding no error in the trial court's judgment, we affirm

Crockett's convictions.

I. BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the

sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the

Commonwealth, the prevailing party in the trial court.'"  *Hammer v. Commonwealth*, 74

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In June and July 2021, Crockett—who is nicknamed "Hawk"—was housed with Forrest Warren in a cell at the Virginia Peninsula Regional Jail. On July 7, 2021, Sergeant Tulia Mahon-Askew, an investigator at the jail responsible for examining incoming mail, discovered twelve "test strips" in a greeting card addressed to Forrest. Two days later, on July 9, 2021, Mahon-Askew found five similar strips in a card addressed to Crockett. Subsequent laboratory testing determined that the strips contained a controlled substance commonly known as suboxone.

Lieutenant Tomala and James City County Police Investigator Dave Rochard investigated the attempted suboxone deliveries. As part of that investigation, they reviewed the recordings of Crockett's and Forrest's telephone and video calls from around the time of the suboxone deliveries.

In a telephone call on June 18, 2021, Forrest's cousin, William Warren, or "Will," asked if Forrest "need[ed] a pack." At trial, Lieutenant Tomala explained that a "pack" usually referred to special meal packages from the jail commissary. Forrest indicated that he might be released after a court hearing the next week. William then asked whether he should "send that to Hawk's name," but Forrest replied that Hawk (*i.e.*, Crockett) could not "get commissary yet." William clarified, "No, I'm saying should I send that, the other thing to Hawk?" Forrest said that he would let William know before the end of the weekend. William responded that he would "hold on to it" because if Forrest were to be released from jail, "it might not get there in time, then the jail has it."

A number of calls took place on June 25, 2021. In the first, Forrest told William that he should "have another buck about to hit now." Trial testimony explained that the term "buck"

- 2 -

referred to money, usually $100. William said that he would put Forrest's "thing" in the mail the next day. Forrest asked whether he meant "the sweet pack," which William confirmed. Forrest said that he was going to be transferred to another facility for "therapy community." William replied that if Forrest left, Crockett should contact William and told Forrest to give his "info" to Crockett and "tell him to hit me up."

In a second call that day, Forrest asked if William had "a buck sent to [him]." William replied that he had not, and Forrest said that William should also have "half of one" coming. Crockett took Forrest's place on the call and asked if William had heard from his brother. William confirmed that Crockett's brother had texted and told him about Forrest's upcoming move, and said that when Forrest left the jail, William would let Crockett know "what's up."

A few minutes later, Forrest called William again and asked if everything arriving would "put [William] up to . . . 350." William confirmed that was correct, and Forrest said he did not know if he would be "able to get the whole five." William told him to "do what you can do" and "make sure to eat." Forrest replied that he wanted to make sure William "get[s] right," and William said that he wanted to make sure that "you guys get to eat, too."

The next day, Forrest called William and told him that "after this go around, let's take a break for a little bit" to "let it die down." Forrest reiterated that "this one's good, but after this we'll take a little break."

On June 28, 2021, William told Forrest that he had ordered a "sweet pack" and it "should be there." Forrest reiterated that they would "take a break or switch the names up after this." William replied that switching the names "would be best" because he was having to pay child support. Forrest said he would "figure it out" and call again. William replied that "it should be" there later that week.

On July 1, 2022, William told Forrest "that thing" should be there "tomorrow or Monday." Forrest said that he would be in disciplinary segregation for the next 45 days so Crockett would call William "about it" to "make sure that everything is straight."

On July 5, 2021, Forrest called William and asked if he had "330" and said that William should have received "200." William replied that he had not received anything, and Forrest told him, "Hawk sent his a few days ago" and "I just had more sent." Forrest said he had "40 cent[s]" and had "got[ten] nothing." Forrest said "something's going on," that he would have Crockett call, and repeated that Crockett had "sent his a few days ago."

About an hour later, Crockett called his brother and asked if he had sent "200" to "Will" on Friday as Crockett had told him to do. His brother said he had not, believing Crockett had wanted him to "hold off." Crockett told his brother to "go ahead and send" the "200" and gave him William's phone number "just to make sure . . . everything gets, gets there and it's, it's good." Crockett said that "he's tripping" because "he thought it got sent, I thought it got sent, I'm cussing at him, he's cussing at me." Crockett continued, "I'm gonna let you go ahead and call Will right now and we'll get that taken care of, 'cause he's flipping out." Crockett told his brother that "all the shit's missing, too, that somebody else was supposed to do" and mentioned a "girl" who was "kind of wishy-washy."

Crockett called William a few minutes later. William reported that Crockett's brother had called him and "got it straight." Crockett said that "Kaitlyn" would have "the rest" for William and that he would call her to have her send it to William, since she had "the rest of it," which he thought was "230." William suggested that on the "next one," he would "put it to" Crockett, but Crockett replied that Forrest did not "want that." William told Crockett to check with Forrest and to tell him that William was "ready whenever" Forrest was.

Shortly afterwards, Crockett again used Forrest's account to call William and confirmed that Kaitlyn did have "230." Crockett also reported that Forrest had said "on the other shit, just keep it the same, . . . he wants to keep control [of] all that." William told Crockett that he "hoped it's helping y'all out." Crockett replied, "Oh yeah, yeah, yeah, definitely, most definitely," and then told William that he "hope[d] it's helping you out some, too." William affirmed that it was helping "a whole lot."

Two days later, the first greeting card containing suboxone strips arrived for Forrest, and the second one addressed to Crockett arrived two days after that, at which point Lieutenant Tomala and Investigator Rochard began their investigation into these attempted deliveries.

At trial, Lieutenant Tomala testified that a person would order a pack from the commissary using a process like shopping online. He explained that the order did not come through the mail; instead, a third-party company delivered items to the jail. Accordingly, any references on the calls to William putting any "pack" or "sweet pack" in the mail would not refer to the commissary meal packs. Investigator Rochard testified that he identified William as the source of the suboxone. He also testified that Kaitlyn was Forrest's girlfriend.

Forrest testified for the defense and denied that he and Crockett had agreed to get drugs sent to the jail. He asserted that the discussions about sending or receiving money, including Crockett telling his brother to send William $200, concerned payment of gambling debts between inmates. He claimed that because inmates were not supposed to gamble or send money, they spoke in code on the phone to avoid getting in trouble. Forrest acknowledged that he had pleaded guilty to conspiring to deliver a controlled substance to an inmate, charges that arose in connection with the same events that led to Crockett's indictments. He maintained, however, that he conspired with Kaitlyn, his girlfriend. Forrest also acknowledged that he had 20 felony convictions, including convictions for crimes of moral turpitude.

After the jury trial, the trial court convicted Crockett of both charges. Crockett moved to set aside the verdict, arguing that the Commonwealth "failed to exclude the reasonable hypothesis that Mr. Crockett's association with the alleged co-conspirators involved money being sent as debt for tattoos, gambling, or even commissary, rather than for drugs as the Commonwealth believed." Following a hearing, the trial court denied the motion and sentenced Crockett to a total of two years' incarceration. Crockett appeals.

## II. ANALYSIS

On appeal, Crockett challenges the sufficiency of the evidence that he willfully participated in the drug-delivery scheme. He argues that the evidence failed to exclude the "reasonable hypothesis" of innocence that he was merely an unwitting intended recipient of the suboxone and that the conversations about money were "related to other legitimate (or illegitimate) endeavors." Crockett emphasizes that "[a]nyone in the world could have mailed" a card to him and the Commonwealth "never even proved that William" sent it.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "[T]he relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment'" for that of the factfinder's. *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

To obtain a conviction for conspiracy to deliver a controlled substance to an inmate, the Commonwealth must prove that the defendant "willfully" "conspire[d] with another" person to effect the delivery. Code § 18.2-474.1. "Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.'" *Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988) (quoting *Wright v. Commonwealth*, 224 Va. 502, 505 (1982)). When the evidence demonstrates that the defendants "*pursued the same object*, one performing *one part* and the others performing *another part* so as to complete it or with a view to its attainment, the [factfinder] will be justified in concluding that they were engaged in a conspiracy to effect that object." *James v. Commonwealth*, 53 Va. App. 671, 678 (2009) (alteration in original) (quoting *Charity v. Commonwealth*, 49 Va. App. 581, 586 (2007)).

"A conspiratorial agreement 'often may only be established by circumstantial and indirect evidence including the overt actions of the parties.'" *Carr v. Commonwealth*, 69 Va. App. 106, 119 (2018) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 636 (2011)); *see James*, 53 Va. App. at 678 ("It is a rare case where any 'formal agreement among alleged conspirators' can be established." (quoting *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1141 (4th Cir. 1980))). "It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).

Moreover, "the Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." *Case v. Commonwealth*, 63 Va. App. 14, 23 (2014) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "Whether an alternate hypothesis of innocence is reasonable is a question of fact

and, therefore, is binding on appeal unless plainly wrong." *Holloway v. Commonwealth*, 57 Va. App. 658, 666 (2011) (quoting *Emerson*, 43 Va. App. at 277). "[I]n considering an appellant's alternate hypothesis of innocence in a circumstantial evidence case, we must determine 'not whether there is some evidence to support' the appellant's hypothesis of innocence, but, rather, 'whether a reasonable [juror], upon consideration of all the evidence, could have rejected [Crockett's] theories in his defense . . . .'" *Id.* at 665 (quoting *Emerson*, 43 Va. App. at 277).

Crockett contends that the Commonwealth failed to disprove his reasonable hypothesis of innocence. Yet Crockett does not contend that he never engaged in these conversations about transferring money; instead, he argues that the money was for paying debts and not drugs. But the jury heard this argument, and it still convicted Crockett of both counts. "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Ray v. Commonwealth*, 74 Va. App. 291, 308 (2022) (alteration in original) (quoting *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017)).

The totality of the circumstances supports the jury's conclusion that Crockett participated in the conspiracy and its decision to reject Crockett's hypothesis of innocence. The evidence shows that Crockett participated in multiple phone calls where he discussed arranging for money to be sent or received with no party saying what the money was for. Some of these phone calls were very tense and urgent. As Lieutenant Tomala testified, the way Crockett and others discussed mailing "sweet packs" on the calls made little sense; drawing the most logical inferences in the light most favorable to the Commonwealth, this was far more likely to be code for an illicit substance. Given the other vague references such as "the other thing" and "that thing," a reasonable factfinder could have concluded that Crockett and others were arranging payment for and receipt of the suboxone.

Moreover, shortly after these conversations occurred, suboxone was sent to Forrest, an active participant in these conversations, and then two days later, suboxone was sent to Crockett. Forrest later pleaded guilty to conspiracy to deliver suboxone to an inmate. Despite the "hypothesis of innocence" that these urgent conversations about sending "packs" and money concerned debts between inmates, it fails to explain why Crockett's brother would be sending funds to William. Accordingly, the evidence in this case, viewed in its totality, with all reasonable inferences drawn therefrom, supports the jury's verdicts that Crockett willfully participated in the conspiracy to deliver the suboxone to the jail.

### III. CONCLUSION

The record contains sufficient evidence from which the jury could reject Crockett's hypothesis of innocence that he was a mere unwitting intended recipient of the greeting card containing the suboxone and find that he willfully agreed with Forrest, William, or both, to deliver suboxone to inmates. The trial court therefore did not err by denying Crockett's motion to set aside the verdict, and we affirm the trial court's judgment.

*Affirmed.*