UNPUBLISHED

# COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Friedman and Raphael
Argued at Richmond, Virginia


RHONN MALIQUE JAMES

v.      Record No. 1557-22-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE FRANK K. FRIEDMAN
MAY 21, 2024


FROM THE CIRCUIT COURT OF HENRICO COUNY
Rondelle D. Herman, Judge

Paul C. Galanides for appellant.

Lucille M. Wall, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Rhonn Malique James of rape by means of mental incapacity or physical helplessness. The trial court imposed a total sentence of 25 years' incarceration with all but 7 years suspended. On appeal, James argues that the trial court erred in admitting expert testimony and in finding the evidence sufficient to sustain his conviction. James also challenges the trial court's rulings regarding certain jury instructions. For the following reasons, we affirm the trial court's judgment.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

On August 24, 2019, S.T.[2] was working in Henrico County as a truck driver with her trainer, Joe Fairley. After work, S.T. accompanied Fairley to the home of Rhonn James. Though James was not home, Fairley—a long-time friend of James's—let himself and S.T. into the house. When James arrived, S.T. and Fairley were already drinking alcohol. The three made normal conversation for a while, but James soon made romantic advances toward S.T. and asked if she would have any interest in a "sugar daddy." The question made S.T. uncomfortable, but she laughed it off and said only if James "didn't want any sugar." James later asked S.T. if she would be interested in a date rape drug. Again, uncomfortable, S.T. declined. S.T. did not leave because James apologized.

Eventually, the group went to a club in Richmond. Fairley and James each bought S.T. drinks, and she consumed at least three mixed drinks at the club. When the club closed at 2:00 a.m., the group returned to James's home. S.T. and James went inside and left an intoxicated Fairley in the car.

S.T. did not feel intoxicated, but after laying down on the bed in James's daughter's room she felt the urge to vomit. S.T. got out of bed and went to the bathroom down the hallway, threw up, and then returned to bed. S.T. next remembered waking up with a man on top of her. S.T. did not see his face but felt his penis penetrating her vagina, and S.T. testified that she felt like she "couldn't move." S.T. did not remember her tights coming off or anyone entering the room. S.T. "tried to write it off as a bad dream" and testified that she did not want to believe that it was real.

---

[1] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[2] Initials are used to protect the identity of the victim.

After the man finished, he got up and left the room without a word. S.T., now fully awake, noticed her leggings were no longer on her body, but were on the ground.

In addition to seeing her leggings, S.T. found James's hat on the bed. She took it and left to question James. She found him in his doorway and asked him what happened, to which he replied, "we had fun." S.T. felt "sick to her stomach" and pushed James, then returned to his daughter's room to grab her truck keys. S.T. was angry and planned to use her firearm to kill James for "rap[ing] [her]," but after retrieving the gun and pointing it at James, S.T. could not pull the trigger. James took the firearm from S.T.'s hand and gave it to Fairley. S.T. then fled to the home of a neighbor whose daughters summoned law enforcement. S.T. hid in nearby bushes until officers arrived.

At trial, Officer Phillips and Detective Crane testified that they arrived on scene and encountered a visibly upset S.T. Each detected the odor of alcohol coming from S.T., and Phillips reported that S.T. had "red, watery, glassy eyes." Crane later transported S.T. to the hospital to undergo a forensic examination.

I. *Nurse Nicole Braxton examines S.T. at the hospital.*

Nurse Braxton met with S.T. at 7:10 a.m. on August 25, 2019, and completed an intake interview before conducting the examination. Nurse Braxton testified that S.T. mentioned she had been drinking and felt "dizzy" and "lightheaded." Because the interview process was lengthy, Nurse Braxton did not begin the examination until 9:30 a.m. Nurse Braxton collected urine and blood samples from S.T. and sent them to be analyzed. Nurse Braxton conceded that her notes contained an error indicating that she "collected the evidence" at 6:25 a.m., but Nurse Braxton clarified that "typically" urine and blood samples would be taken before the examination, which began at 9:30 a.m. Ultimately, Nurse Braxton could not remember exactly when she collected the

samples.  Following Nurse Braxton's testimony, James moved to exclude the blood results due to a break in the chain of custody.  The trial court denied James's request.

Forensic Scientist Delisa Downey received S.T.'s blood and urine samples and analyzed them to determine S.T.'s level of intoxication.[3]  Because the blood samples were taken at a hospital, they were stored in red-topped tubes, which allowed the sample to clot.  Downey performed a "homogenization" to break up the clot for testing and determined that S.T.'s blood alcohol content (BAC) was .08.

Dr. Robyn Amos-Kroohs testified as a toxicology expert and explained the "retrograde extrapolation" analysis that she performed on the blood sample.  That process allowed her to "take a point in time with an ethanol value associated with it and work backwards using the steady state rate of ethanol elimination within the body to estimate a blood alcohol concentration at a previous point in time."  Dr. Amos-Kroohs conceded she had never met with or evaluated S.T. and that her calculations were based on studies of the general population and were intended to provide "conservative" estimates.  Dr. Amos-Kroohs testified that the "general population elimination rate" for alcohol was .01 to .02 "percent by weight by volume elimination rate per hour."

Due to the uncertainty of when the blood was drawn, Dr. Amos-Kroohs calculated several possible results using Braxton's noted times as a starting point.  Because officers arrived at 4:04 a.m., Dr. Amos-Kroohs's calculations assumed the sexual intercourse occurred at approximately 3:45 a.m.  Dr. Amos-Kroohs determined that S.T.'s BAC may have ranged between .108 and .135, .12 and .15, or .138 and .195, depending on the time of the blood draw. Dr. Amos-Kroohs also testified that as alcohol concentrations increase, a person may experience "memory loss," an inability "to stay awake," slowed reactions, and may even "pass[] out."

---

[3] Downey testified that the urine sample was not properly sealed and arrived with a leak, which could degrade the accuracy of any testing.  The trial court excluded the results of the urinalysis.

Dr. Amos-Kroohs explained that vomiting helps the body rid itself of excess alcohol and that women may experience the effects of alcohol at lower concentrations because of "higher generalized fat deposits."

> II. *James conceded that he had sex with S.T. but argued that S.T. was not mentally incapacitated.*

After the close of the Commonwealth's case, James moved to strike the evidence, arguing that because S.T. woke up and felt penetration, she was not mentally incapacitated. He contended that recognizing penetration denotes understanding of the "nature and consequences" of the sexual act. He also argued that she was not physically helpless because she was awake when she felt penetration. The trial court denied James's motion to strike, noting S.T.'s testimony regarding the quantity of alcohol consumed, her "dream-like" state after waking up, her dizziness, and the officers' testimony regarding the odor of alcohol.

Fairley testified for the defense and recounted that James and S.T. hit it off quickly and flirted throughout the night. According to Fairley, S.T. was not bothered by James's jokes, and laughed them off. Fairley told the jury that he purchased two drinks for S.T. at the club and that James bought her one.

James testified in his own defense and conceded that he had sex with S.T. According to James, S.T. was drinking and smoking when he first arrived at home and S.T. laughed and flirted throughout the night despite his off-color jokes. James stated that S.T. "sipp[ed]" her drinks and never stumbled, slurred her words, or otherwise appeared intoxicated, and had no trouble with the stairs to James's daughter's bedroom. According to James, after the group returned from the club he sat on his bed and played with his phone for a while. But when James opened his door and saw S.T. in the hallway, he followed S.T. into the bedroom because they made eye contact, which James interpreted as "interest."

James testified that the two started "making out," and when his hands found their way to S.T.'s waist, she lifted her body, and James removed her tights. According to James, the two then performed oral and vaginal sex. James claimed that S.T. was a conscious and active participant. James stated that after he finished, he abruptly left the room without a word to go clean up. According to James, he was surprised that S.T. was upset after he told her they "had fun."

James called Dr. Richard McGarry as a toxicology expert. He testified that a person would likely not be vomiting at a BAC as low as .10 to .13. He indicated that vomiting was associated with extreme intoxication, which he described as .20 to .30. In rebuttal, the Commonwealth recalled Dr. Amos-Kroohs. She testified that in her experience, she had witnessed vomiting at concentrations as low as .09. She also testified that memory loss could begin as low as .18.[4]

III. *James and the Commonwealth presented the trial court with ten agreed-upon jury instructions.*

The jury instruction defining rape noted that the Commonwealth must prove that S.T. "was mentally incapacitated or physically helpless." James proffered two jury instructions defining criminal negligence. The first instruction read, verbatim:

> In order to find the defendant guilty of rape the Commonwealth must show that the defendant knew or should have known that . . . [S.T.] was mentally incapacitated or physically helpless. The requirement that the defendant knew or should have known means that the Commonwealth has to show that the conduct of the defendant constitutes a great departure from that of a reasonable person (gross, wanton or willful conduct) which creates a great risk of harm to others and where by the application of an objective standard the accused should have realized the risk created by his conduct.

The second instruction read, verbatim:

> To prove that the Defendant knew or should have known that the Defendant was mentally incapacitated or physically helpless requires the Commonwealth to prove that the conduct of

---

[4] Though James moved to strike the evidence at the close of the defense case, he did not renew this motion after the Commonwealth presented its rebuttal.

the Defendant was of a wanton or willful character, committed or omitted, show a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his [or her] acts.

The trial court rejected both instructions. In doing so, it questioned whether the first would assist the jury in understanding the meaning of "knew" or "should have known" because the language was confusing. Further, the trial court noted that the instruction contained additional undefined words, such as wanton and gross.

The jury convicted James. Before sentencing, James moved to set aside the verdict. In his written motion and oral argument, James argued that the trial court improperly permitted expert testimony relating to S.T.'s blood draw because the broad range of potential concentrations amounted to speculation. He further asserted that the blood was not "placed in the right tubes" and needed to be "reconstituted." James argued that the trial court erred by rejecting his proposed criminal negligence instructions and by permitting the Commonwealth's rape instruction which allowed alternative theories of guilt. James also argued that the trial court improperly found the evidence sufficient to establish mental incapacity or physical helplessness.

The trial court denied James's motion, finding that his failure to note a timely objection to Dr. Amos-Kroohs's testimony rendered the issue waived. The trial court confirmed its ruling regarding James's criminal negligence instruction, holding that it was "duplicative," "convoluted," and would have confused the jury. Finally, the trial court rejected James's sufficiency claim. The trial court sentenced James to 25 years' incarceration with 18 years suspended. James appeals.

ANALYSIS

I. *James waived any challenge to the admission of Dr. Amos-Kroohs's expert testimony.*

James argues that the trial court erred in permitting Dr. Amos-Kroohs's expert testimony because it lacked sufficient foundation and was speculative in nature. James concedes that he did not object to the challenged testimony at trial, but requests that this Court review the issue under the ends of justice exception to Rule 5A:18's contemporaneous objection requirement.

"'The ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Conley v. Commonwealth*, 74 Va. App. 658, 682 (2022) (quoting *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc)). Applying the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Commonwealth v. Bass*, 292 Va. 19, 27 (2016) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)). These two requirements must remain distinct: "if every trial court error also constitutes a grave or manifest injustice," then the ends of justice exception will swallow "the rule requiring a contemporaneous objection." *Brittle v. Commonwealth*, 54 Va. App. 505, 513 (2009). "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt*, 66 Va. App. at 210 (quoting *Brittle*, 54 Va. App. at 514). Thus, the ends of justice exception to Rule 5A:18 "requires proof of an error that was 'clear, substantial[,] and material.'" *West v. Commonwealth*, 43 Va. App. 327, 338 (2004) (quoting *Brown v. Commonwealth*, 8 Va. App. 126, 132 (1989)). An "appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur." *Redman v. Commonwealth*, 25 Va. App. 215, 222 (1997).

Here, assuming without deciding that the trial court erred in allowing Dr. Amos-Kroohs's testimony, James does not assert, let alone "affirmatively show" that a miscarriage of justice has

occurred. He argues only that the "error" was "not . . . harmless." Harmful error, however, is not sufficient to trigger application of the exception. Even constitutional errors may fail to satisfy Rule 5A:18's strict requirements. *See Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998) ("Rule 5A:18 applies to bar even constitutional claims."). James argues that Dr. Amos-Kroohs's expert testimony was "essential" for the jury to believe S.T. was intoxicated. However, the record contains significant evidence of S.T.'s intoxication. The jury heard testimony that S.T. had consumed numerous drinks, smelled of alcohol, vomited, and was dizzy.

Even setting Dr. Amos-Kroohs's retrograde extrapolation aside, S.T.'s BAC was .08 many hours after she had stopped drinking. The weight afforded to the evidence was a determination for the jury, and James does not demonstrate that Dr. Amos-Kroohs's testimony was the dispositive factor in the jury's decision. At most, James asserts that a miscarriage of justice *might* have occurred. *Redman*, 25 Va. App. at 221 (stating that the appellant "must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred"). We therefore find that the issue was waived.

II. *The Commonwealth presented sufficient evidence for the jury to conclude S.T. was physically helpless.*

James argues that the trial court erred in finding the evidence sufficient to conclude that S.T. was in a state of either physical helplessness or mental incapacity.[5] We disagree.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does

---

[5] James requests we invoke the ends of justice exception to Rule 5A:18, but James preserved this issue. *See Bass*, 292 Va. at 33 ("In a jury trial, the defendant preserves his objections to the sufficiency of the evidence in a . . . motion to strike at the conclusion of all the evidence or a motion to set aside the verdict if he does elect to introduce evidence of his own.").

not ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt.'" *Id.* (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). Instead, we ask only "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Secret*, 296 Va. at 228). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Id.* (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). This Court defers to the factfinder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Abdullah v. Commonwealth*, 53 Va. App. 750, 755 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Moreover, "the testimony of a single witness, if found credible by the trial court and not found inherently incredible by this Court, is sufficient to support a conviction." *McCary v. Commonwealth*, 36 Va. App. 27, 41 (2001).

Sexual offenses are, "at core, . . . offense[s] against the will and consent of the victim." *Davison v. Commonwealth*, 69 Va. App. 321, 330 (2018) (quoting *Molina v. Commonwealth*, 47 Va. App. 338, 357, *aff'd*, 272 Va. 666 (2006)). "[T]he inability to freely exercise will and give consent[,]" however, is not always "a function of force, threat or intimidation by the perpetrator." *Molina*, 47 Va. App. at 358. Instead, "force, physical helplessness, and mental incapacity present 'several possible sets of underlying facts' that determine whether the victim's will was overcome." *Davison*, 69 Va. App. at 330 (quoting *Jackson v. Commonwealth*, 266 Va. 423, 435 (2003)).

The Commonwealth need not prove that the victim was both mentally incapacitated and physically helpless to sustain convictions for such offenses; either is sufficient by itself. *Id.* at 330-32. Here, the record contains extensive evidence supporting a conviction under the "physical helplessness" analysis.

"'*Physical helplessness*' means unconsciousness or any other condition existing at the time of an offense . . . which otherwise rendered the complaining witness physically unable to communicate an unwillingness to act and about which the accused knew or should have known." Code § 18.2-67.10(4). Like mental incapacity, the question of whether a victim was physically helpless at the time of the sexual offense is a factual question that will not be reversed on appeal unless it is plainly wrong or without evidentiary support. *Woodward v. Commonwealth*, 12 Va. App. 118, 121 (1991).

James argues that S.T. was not physically helpless because she "immediately" perceived that James was penetrating her "after she awoke," and, thus, she was conscious when penetration occurred. We disagree. In *Woodward*, we affirmed a rape conviction involving a sleeping victim, rejecting Woodward's argument that because the victim "remembered 'a presence getting into the bed'" she was not truly physically helpless. 12 Va. App. at 120. We held that "sleep is not an all or nothing condition" and that while the victim was sleeping, she was "in a state of physical helplessness." *Id.* at 121. Ultimately, we held that "engaging in sexual intercourse with a sleeping victim can constitute commission of the crime of rape, in violation of Code § 18.2-61, by means of the victim's 'physical helplessness.'" *Nelson v. Commonwealth*, 73 Va. App. 617, 627 n.5 (2021) (quoting *Woodward*, 12 Va. App. at 120-21).

Here, the jury had to decide the factual issue of whether S.T. was asleep—and therefore in a state of physical helplessness—when James had sexual intercourse with her. S.T. testified that when she awoke and saw the "silhouette" of a person over her, she felt a penis "already in" her vagina. James argues that S.T. woke up before she perceived James's presence and that she was an active participant in the sexual intercourse. But the credibility and weight afforded to testimony, or any part of it, is a determination for the factfinder and not this Court on appeal. *James v. Commonwealth*, 53 Va. App. 671, 679 n.2 (2009). Considered in the light most favorable to the

Commonwealth, S.T.'s testimony established that she was not conscious when James first penetrated, and thus, like the victim in *Woodward*, was "in a state of physical helplessness." 12 Va. App. at 120-21. Accordingly, the trial court did not err in finding the evidence sufficient and in denying James's motion to set aside the verdict.[6]

III. *The trial court did not err by rejecting James's proposed jury instructions.*

An appellate court's "responsibility in reviewing jury instructions is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Conley*, 74 Va. App. at 675. "[W]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Dandridge v. Commonwealth*, 72 Va. App. 669, 676 (2021) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 260 (2018)). "[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

A. *Alternative Theories*

James argues that the disjunctive form of the instruction defining the elements of rape provides "no way of knowing which of the two elements the jury relied upon because the two concepts were offered . . . *in the alternative*." James contends the instruction thus invited a non-unanimous verdict. But James did not raise this argument at trial and, in fact, agreed to the jury

---

[6] Finding evidence of S.T.'s physical helplessness to be clear and to support the verdict, we need not reach the question of her mental incapacity. Our precedent requires us to seek "the best and narrowest ground available" for our decision. *Armstead v. Commonwealth*, 56 Va. App. 569, 576 (2010).

instruction.[7]  "The defendant, having agreed upon the action taken by the trial court, should not be allowed to assume an inconsistent position."  *Clark v. Commonwealth*, 220 Va. 201, 214 (1979).  "No litigant, even a defendant in a criminal case, will be permitted to approbate and reprobate -- to invite error . . . and then to take advantage of the situation created by his own wrong."  *Fisher v. Commonwealth*, 236 Va. 403, 417 (1988).  Accordingly, we do not address this argument.

### B. *Criminal Negligence*

James argues that, because his defense rested on a claim of consent, it was proper to instruct the jury on the standard for criminal negligence.  James asserts that his instructions properly defined

---

[7] The agreed-to instruction stated:

> The defendant is charged with the crime of rape.  The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> > (1)  That the defendant had sexual intercourse with [S.T.]; and
> >
> > (2)  That at the time [S.T.] was mentally incapacitated or physically helpless; and
> >
> > (3)  That at the time of the offense, the defendant knew or should have known [S.T.] was mentally incapacitated or physically helpless; and
> >
> > (4)  That the sexual intercourse was accomplished through the use of the complaining witness's mental incapacity or physical helplessness.
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty.
>
> If you find from the evidence that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of the offense as charged, then you shall find the defendant not guilty.

the terms "knew or should have known" and that the trial court improperly rejected them as "confusing" despite being supported by more than a scintilla of evidence.

We agree that a defendant is entitled to a jury instruction upon his theory of the case when it is adequately accompanied by evidence. *Williams v. Commonwealth*, 64 Va. App. 240, 246 (2015). Nonetheless, a trial court is not required to accept instructions if they are deficient in some other manner. A trial court does not abuse its discretion when it excludes an instruction that "would have created confusion and would have been misleading." *Hubbard v. Commonwealth*, 243 Va. 1, 15 (1992) (finding that "attempting to inject inapplicable principles of civil negligence into a criminal trial . . . would have created confusion and would have been misleading"). Nor does a trial court abuse its discretion by refusing a relevant instruction if the granted instructions "fully and fairly cover" the same legal principle. *Payne*, 292 Va. at 869 (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 229 (2013)). "The burden is on the proponent of the instruction 'to satisfy the trial court that the proposed language is a correct statement of the law, applicable to the facts of the case on trial, and expressed in appropriate language.'" *Miller v. Commonwealth*, 64 Va. App. 527, 547 (2015) (quoting *Shaikh v. Johnson*, 276 Va. 537, 546 (2008)).

Here, the trial court determined that James's proffered instructions were "confusing" and "convoluted." The trial court found that a "reasonable juror with reasonable intelligence could easily be confused by" James's instructions and that the use of several additional and undefined terms in the instructions—such as gross, wanton, and willful—would serve only to cause confusion. Finally, the trial court found that the instructions were duplicative considering other accepted instructions. We find no error in the trial court's rejection of James's proposed instructions.

CONCLUSION

For the foregoing reasons, we affirm James's conviction.

*Affirmed.*